NATIONAL LEAD COMPANY,
Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

The SHERWIN–WILLIAMS COM-
PANY, Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

The EAGLE–PICHER COMPANY et al.,
Petitioners,

v.

FEDERAL TRADE COMMISSION,
Respondent.

ANACONDA COPPER MINING COM-
PANY et al., Petitioners,

v.

FEDERAL TRADE COMMISSION,
Respondent.

Nos. 10839–10842.

United States Court of Appeals
Seventh Circuit.

Dec. 1, 1955.

Eugene Z. Du Bose, New York City, James D. Ewing, J. Kenneth Campbell, New York City, Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., Alexander & Green, New York City, of counsel, for petitioner National Lead Co.

Thomas J. McDowell, Cleveland, Ohio, Miles G. Seeley, Chicago, Ill., J. T. Van Keuls, Cleveland, Ohio, Roger W. Barrett, Chicago, Ill., Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., of counsel, for Sherwin-Williams Co.

Edmund P. Wood, Cincinnati, Ohio, Nathan S. Blumberg, Chicago, Ill., Richard Serviss, Cincinnati, Ohio, Jacob Logan Fox, Wallace R. Sollo, James A. Blumberg, Chicago, Ill., Wood, Herron & Evans, Cincinnati, Ohio, Brown, Fox, Blumberg & Markheim, Chicago, Ill., of counsel, for Eagle-Picher Co. and Eagle-Picher Sales Co.

Harlan L. Hackbert, Chicago, Ill., Horace G. Hitchcock, New York City, Stevenson, Conaghan, Velde & Hackbert, Chicago, Ill., Chadbourne, Parke, Whiteside, Wolff & Brophy, New York City, Melvin D. Goodman, Alan S. Kuller, New York City, of counsel, for petitioners Anaconda Copper Min. Co. and International Smelting & Refining Co.

Robert B. Dawkins, Asst. Gen. Counsel, Federal Trade Commission, Earl W. Kintner, James E. Corkey, J. J. Gercke, Washington, D. C., for Federal Trade Commission.

Before LINDLEY, SWAIM and SCHNACKENBERG, Circuit Judges.

LINDLEY, Circuit Judge.

Petitioners seek to set aside a cease and desist order entered by the Federal Trade Commission on an amended complaint charging them and the Glidden Company with violation of Section 5 of the Trade Commission Act, 15 U.S.C.A. § 45(a), and Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13. Count I of the complaint, filed April 12, 1946, charged that petitioner, National Lead Company, had violated and was violating "Section 5 * * * by monopolizing, attempting to monopolize and acting to control the sale of lead pigments and the prices thereof in commerce", and that all named parties were violating the Act by combining and conspiring "among themselves and with each other" for the purpose and with the effect of eliminating competition in prices and terms of sale of lead pigments in commerce. Count II charged all parties with discrimination in prices by means of various zone pricing methods and quantity and functional discounts.

Various attacks are made upon the validity of the order, or portions thereof, addressed to the alleged insufficiency of the evidence to support the findings and to the scope of the order. Some of the questions posed apply only to a single petitioner, while others are applicable to all.

I. Propriety of The Order Against Anaconda Copper.

We shall first dispose of the contention of petitioner Anaconda Copper Mining Company that the order cannot stand as to it, based on its assertion that it has never engaged in the industry as a producer, distributor or otherwise. In 1919, Anaconda Lead Products Company, a wholly owned subsidiary of Anaconda Copper, began production of lead pigments. International Smelting & Refining Company, another wholly owned subsidiary, acquired all the assets of Anaconda Lead in 1936 and thereafter, until 1946, engaged in production of certain lead pigments which were sold by it and by Anaconda Sales Company, a third subsidiary of Anaconda Copper. International was a respondent in the proceeding and is one of the petitioners here. Anaconda Lead (dissolved in 1936) and Anaconda Sales are not parties.

At the conclusion of the evidence in support of the complaint, Anaconda moved to dismiss as to it, urging that

the evidence failed to show that it had ever engaged in manufacture or sale of the products. The Commission denied the motion, holding that Anaconda had been engaged in the pigments field "through its wholly owned subsidiaries." The Commission found that International and Anaconda Lead "were in fact mere operating divisions of respondent Anaconda, with no substantial separate identity of their own", and that all their acts and those of Anaconda Sales were those of Anaconda. On this basis, the cease and desist order was directed against Anaconda Copper.

We have searched in vain for evidence of a substantial character to support the findings on this phase of the case. Though the record shows that International, Anaconda Lead and Anaconda Sales are wholly owned subsidiaries of petitioner and in September 1947, at a date after International had withdrawn from the field, Anaconda, Anaconda Sales and International were controlled by interlocking boards of directors and officers, there is no evidence which militates against the existence and activity of these subsidiaries as separate entities at any time pertinent to this inquiry. Thus, though the evidence tends to prove the incidents of a parent-subsidiary relationship, a fact which has never been in dispute, the closely correlated operation of International and Anaconda Sales reflects no sinister connotation of domination by their common parent, keeping in mind that the only function for which Anaconda Sales was organized was to sell products produced by International in certain western states in which the latter was not licensed to do business.

■■ These sparse gleanings from the record fail to support the Commission's finding of substantial identity. To come within the applicable rule, there must be evidence of such complete control of the subsidiary by the parent as to render the former a mere tool of the latter, and to compel the conclusion that the corporate identity of the subsidiary is a mere fiction. Press Co. v. N. L. R. B., 73 App.D.C. 103, 118 F.2d 937, at pages 946–947, certiorari denied 313 U.S. 595, 61 S.Ct. 1118, 85 L.Ed. 1548; Owl Fumigating Corp. v. California Cyanide Co., Inc., 3 Cir., 30 F.2d 812. Such a finding has no substantial support in this record. The complaint should have been dismissed as to this petitioner.

II. The Conspiracy Findings.

The principal question raised by the remaining petitioners is whether the Commission's findings that the parties conspired to fix and control the prices and bases for sale of lead pigments is supported by substantial evidence. The parties are National Lead Company, Eagle-Picher Lead Company, together with its affiliate Eagle-Picher Sales Company, The Sherwin-Williams Company and International Smelting & Refining Company. The Glidden Company, though not a petitioner, was also charged as a coconspirator. All are engaged in the production, sale and distribution of lead pigments. National is the leader and produces some 50% or more of the domestic production. Its nearest competitor, Eagle-Picher, accounts for a substantial part of the remaining 50%, while each of the other companies occupies a relatively minor position in the industry.

The three principal products included in the lead pigments category are dry white lead, white lead-in-oil [1] and the lead oxides, red lead and litharge. White lead is used principally as a base in paints and its chief market lies in the demands of manufacturers of mixed paints. White lead-in-oil is a semi-mixed paint consumed principally by the individual painter or painting con-

---

1. This term, when used herein, includes all the so-called keg products, red lead-in-oil, etc. The keg products are used principally as pigments for paints, and marketing practices for these products are the same as those employed in marketing white lead-in-oil.

tractor who prefers to mix his own paints. The oxides are used mostly by the battery industry as the basic constituent in the manufacture of plates.

Throughout the record, a clear distinction is drawn between the several parties' respective actions in sales of each of the three kinds of pigments. Although the evidence as to practices in each of these fields differs, there are, nevertheless, certain threads of similarity in the methods employed by the various petitioners which render it practical to treat the conspiracy question as a unit, pointing out, wherever necessary, the applicability or inapplicability of a particular evidentiary segment to one or more of the several petitioners. Each engages in the production of white leads and oxides, except that International confines its activities to white leads and has never produced oxides. [2] Unless otherwise noted, all facts narrated and all statements pertinent thereto apply to all petitioners alike, except that factual statements and discussion which relate solely to the oxides apply to all petitioners except International.

The facts as found by the Commission follow. Prior to 1933 no standard pricing system was employed in the industry. Each producer established its own practices as to prices and conditions of sale. For the most part, with respect to delivered sales prices, each employed its own system of pricing, based on shipping differentials from centrally located warehousing points. For example, National's lists from 1920, until 1933, include some 589 different cities in 40 states, which it, from time to time, used as free delivery or equalization points. The practices of other petitioners differed quite widely.

In 1933, however, each petitioner participated in discussions looking to the adoption of a code of fair competition under the provisions of the National Industrial Recovery Act. These discussions occurred in two committees set up by the Lead Industries Association, one to draft a code for white lead-in-oil marketing and the other a code for the dry pigments, including dry white lead. Discussion within each group dealt with a wide range of subjects relating to prices, freight, quantity and quality differentials and terms and conditions of sales. Tentative agreements, at least, were reached as to terms of the proposed code, including an agreement to sell pigments only on a delivered price basis.

With respect to white lead-in-oil, prices were to be based on a system of par and premium zones, sales were to be made by agency or consignment methods of merchandising, and premium differentials in steps amounting to $\frac{1}{4}$ cent per pound on an ascending scale were to be added on sales in 50, 25 and $12\frac{1}{2}$ pound containers over the price based on the norm of a 100 pound container. For dry white lead, a zone system of pricing was approved, as was a $\frac{1}{4}$ cent per pound premium to be added to less-than-carload shipments of less than 20 tons. In effect, the committee agreed not to adopt uniform conditions for sales, on advice of counsel that to do so might amount to a violation of the antitrust laws. Instead, an alternative course was suggested, namely, that one or more of the parties put into effect the uniform terms under discussion, which the others might follow. Agreements in the group considering oxide sales dealt with separate zone systems for carload and L.C.L. sales, including a standard price for carload sales pegged on the cost of pig lead as shown by daily quotations of the American Smelting & Refining Company, [3] a price for L.C.L. sales based on a premium differential over the carload price and a premium differential to be added

2. International withdrew from the pigments field entirely in 1946. Its contentions based on this fact are subsequently considered herein.

3. This Company will be referred to as AS&R hereafter.

to the price of red lead containing a $Pb_3O_4$ content of 95% or higher.

Certain of these provisions were included in the code, while others apparently never reached that stage. The code, though adopted, never became operative, however, inasmuch as petitioners, immediately upon its adoption, sought and obtained exemption from its terms.

The Commission found that petitioners, during the NRA discussions, agreed to "cooperatively revise the pricing practices" in the industry in such a manner as to constitute a violation of the Trade Commission Act, and effectuated that agreement by adopting uniform methods of pricing and sales throughout the United States. Practices found to have been put in effect pursuant to that plan in the sale of white lead-in-oil follow. Beginning in early 1934, petitioners began pricing the product on a uniform, delivered card price basis in a par zone enclosing all the area bounded roughly by the western borders of the States of Wisconsin and Illinois and by the southern boundaries of the States of Kentucky, West Virginia, Maryland and Delaware, but including the City of Saint Louis, Missouri, and the San Francisco area of California. The remainder of the nation was divided into some 7 premium zones in which premiums ranging from 12½ cents to $1.00 per cwt. were added to the par zone selling price. About the same time, petitioners, except Sherwin-Williams, adopted a consignment method of selling, under which stocks were consigned to dealers to be sold at the standard card price, plus premiums, if any, on a commission basis. Thirdly, a quantity differential was imposed upon sales in container sizes less than 100 pounds as follows: ¼ cent per pound on 50 pound, ½ cent per pound on 25 pound and ¾ cent per pound on 12½ pound containers. One variation was noted by the Commission, viz., International, Sherwin-Williams and Glidden systematically fixed their card prices to dealers for white lead-in-oil, at

about 25 cents per cwt. below that fixed for National's "Dutch Boy" and Eagle-Picher's "Eagle" brands. It found, however, that the product of all petitioners was offered to the public at identical prices, and that the 25 cent reduction of these companies in dealers' prices was a device intended to encourage dealer incentive to promote sales of the products in competition with the widely known and accepted "Dutch Boy" and "Eagle" brands.

The following practices were found to have been adopted with respect to sales of dry white lead. All sales were made at a standard delivered price basis in a par zone, which included all states east of the eastern borders of Montana, Wyoming, Colorado and New Mexico. A premium of 25 cents per cwt. was added on all sales in states west of this boundary. Uniformly, a premium differential of 25 cents per cwt. was added to the price on L. C. L. sales of less than 20 tons.

With respect to oxides sales, the Commission found that petitioners, in 1934, adopted a uniform zone pricing system, with separate zone prices for carload and L. C. L. sales. For purposes of the former, the United States was divided into two par zones and a single premium zone, while, for the latter, a single par zone and three premium zones were established. Prices were fixed on the basis of differentials of $1.50 and $2.50 per cwt. over AS&R's quotation for pig lead, geared to fluctuate up or down with fluctuations of 25 cents or more. This was the standard price for carload sales. A premium of 40 cents per cwt. was added to L. C. L. sales of five tons or more and of 90 cents per cwt. over the carload charges for sales of less than five tons. Uniform premium prices of 25 and 50 cents per cwt., based on lead content, were established for red lead containing a $Pb_3O_4$ content of 95% and above. As to sales of all dry products, including dry white lead, the Commission found that petitioners adopted terms of sale of 1% cash in 10 days, net 30 days or 2% cash in 10 days, net 30

days, and that at any given time the terms as quoted by all petitioners were identical.

■ With the exception of Sherwin-Williams, petitioners do not dispute the finding that they employed uniform zone pricing systems. In this respect they question only the sufficiency of the evidence to support the findings that petitioners adopted the zone systems pursuant to agreement and that all adopted it at or about the same time. The most that can be said of these contentions is that in some respects the evidence is conflicting. It includes the testimony of petitioners' officers, price cards, invoices and other exhibits on which the Commission could well find that all petitioners adopted the zone system of pricing shortly following the NRA discussions. The Commission has resolved the conflict in the evidence adversely to petitioners and it is beyond our province to substitute our judgment in that respect.

■ The argument of Sherwin-Williams that it did not employ the zone system of pricing must also fail. That company employs, for example, an elaborate list of cities throughout the area in which it does business showing many of them as equalization, or par, points, and others as localities warranting, as they say, premium prices ranging from 12½ to 75 cents per cwt. on sales of white lead-in-oil. Comparison of this list with the zone maps employed by the other petitioners reveals that the par and premium city listings conform precisely in physical location and scale of premium charges with the established zone system of other petitioners. In view of this evidence, we cannot say that the finding that this petitioner participated in and used the uniform zone system lacks substantial support.

The most serious attack lodged against the conspiracy findings is that there is no substantial support for a finding of existence of an agreement among the parties to adopt uniform prices and terms of sale. The corollary of that position, viz., that the striking similarity between prices, practices and the conditions of sale fixed by each petitioner is merely the effect of conscious parallelism on the part of petitioners in the sale of products of standard quality and constituent content, is likewise advanced. Although submitted as separate questions, we think the two issues so inextricably related as to require that they be treated together.

■ Although there is no direct evidence as to formal agreement on the part of petitioners to adopt the zone system and uniform pricing practices, the finding does not necessarily fall. A conspiracy may be proved by circumstantial evidence. Triangle Conduit & Cable Co. v. F. T. C., 7 Cir., 168 F.2d 175, affirmed sub nom. Clayton Mark & Co. v. F. T. C., 336 U.S. 956, 69 S.Ct. 888, 93 L.Ed. 1110; Allied Paper Mills v. F. T. C., 7 Cir., 168 F.2d 600, certiorari denied 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081. As we observed in Fort Howard Paper Co. v. F. T. C., 7 Cir., 156 F.2d 899, at page 906, certiorari denied 329 U.S. 795, 67 S.Ct. 481, 91 L.Ed. 680:

"Very pertinently it was pointed out in the Maltsters case, [United States Maltsters Ass'n v. F. T. C., 7 Cir.], 152 F.2d [161], at pages 162 and 164: 'As might be expected, there is little, if any, direct proof of an express agreement. Such proof, however, is not necessary. The agreement may be inferred or implied from the acts and conduct of the parties as well as circumstances pertinent thereto.'"

And, in Milk & Ice Cream Can Institute v. F. T. C., 7 Cir., 152 F.2d 478, at page 480, we said:

"In determining whether such finding [of an agreement to fix prices] is supported, it is not necessary, as argued, that there be direct proof of an agreement. Such agreement may be shown by circumstantial evidence, and the Commission, the same as any other fact

finding body, is entitled to draw any reasonable inference from the circumstances of the situation."

There is before us evidence that petitioners met in 1933 and 1934 in the committees of the Lead Industries Association and discussed and appraised all elements of pricing and sales practices affecting the industry. The minutes of those meetings and the correspondence between the parties, or between certain of them and officers of the committees, support the conclusion that there were wide areas of tentative agreement upon revisions of such practices. As previously stated, some of these tentative agreements were included in the code adopted in May of 1934. We have found that the evidence sustains the finding that all petitioners did, in fact, adopt the zone system of pricing in May 1934 or shortly thereafter. Price cards and other exhibits tend to show that zoning, and other aspects of uniform pricing, were uniformly adopted practically simultaneously by all petitioners and that changes in certain details from time to time have been put into effect by all petitioners practically simultaneously. The inference of agreement, if not necessarily impelled by this evidence, is certainly a reasonable one which the Commission as the trier of fact was entitled to draw therefrom. Milk & Ice Cream Can Institute v. F. T. C., supra, 152 F.2d at page 480; Fort Howard Paper Co. v. F. T. C., supra, 156 F.2d at pages 906–907; Allied Paper Mills v. F. T. C., supra, 168 F.2d at page 607. Our language in the latter case, 168 F.2d at page 607, is pertinent, to-wit:

"We cannot say that the Commission's inferences are unreasonable. The petitioners did with varying uniformity use the zoning system of price quoting, and the existence of this plan which equalizes delivered prices of competitors having widely different costs at a given destination, is strong evidence in itself of an agreement to use such plan. * * * Moreover,

a uniform participation by competitors in a particular system of doing business, where each is aware of the others' acts and where the effect is to restrain commerce, is sufficient to establish an unlawful conspiracy. William Goldman Theatres, Inc., v. Loew's, Inc., 3 Cir., 150 F.2d 738, 745."

It is unimportant, we think, that this record does not disclose a closely knit operation by petitioners under a central information gathering and disseminating body as was the fact in such cases as F. T. C. v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, and the Milk Can Institute case, supra. The absence of this aspect of many price fixing agreements may indicate nothing more than that the very small number of competitors involved in the field rendered needless such a watchdog agency.

Petitioners, to refute the finding of conspiracy, rely, also, on evidence of sales prices which varied from the card prices. This, it seems to us, is merely an invitation to weigh the evidence and re-determine the facts. However, assuming *arguendo* that the question is properly ours to decide, it is clear that such off-card sales as the record discloses represent only a minute percentage of the hundreds of sales reflected in invoices included in the record. And, in the oxides field, such sales represent substantially uniform price concessions to large battery manufacturers to discourage them from producing their own supplies of oxides. Furthermore, it is clear that a finding of unbending price uniformity is not a requisite of a finding of conspiracy to control prices, but that any device which has the purpose and effect of fixing prices to consumers is an illegal restraint of trade. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222–223, 60 S.Ct. 811, and "it is not important that the prices fixed were not fixed in the sense that they were uni-

form and inflexible." Allied Paper Mills v. F. T. C., 7 Cir., 168 F.2d 600, 607. The same principle applies to evidence that petitioners' bids on government contracts frequently were not uniform. We cannot say that the inference of agreement cannot stand in the face of such evidence.

■ What has been said with reference to agreement disposes in part of the conscious parallelism argument. Petitioners contend that National is the price leader in the field and that the other petitioners merely meet its prices in order to stay in business. While parallel business behavior among competitors is not illegal *per se*, Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 541, 74 S.Ct. 257, 98 L.Ed. 273, we do not believe the protective mantle of "conscious parallelism" can clothe with immunity a system employed by substantially all members of an industry whereby all offer their products for sale at any given time and at any given point throughout the nation at identical prices, without regard to differences in shipping costs. See Allied Paper Mills case, supra, 168 F.2d at page 607; Fort Howard case, supra, 156 F.2d at page 907; Milk Institute case, supra, 152 F.2d at page 483. This pricing structure seems so arbitrary and artificial as to negative an inference of innocent parallel behavior and to require an inference of at least tacit prearrangement, in view of the record disclosures that all petitioners participated in discussions at which they explored the advantages of the very pricing practices which shortly later they uniformly adopted. American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S. Ct. 1125, 90 L.Ed. 1575; Interstate Circuit, Inc., v. United States, 306 U.S. 208, 226–227, 59 S.Ct. 467, 83 L.Ed. 610; Allied Paper Mills v. F. T. C., supra, 168 F.2d at pages 607–608.

■ Closely related to the parallel behavior argument is Eagle-Picher's assertion that, although it systematically matched National's pricing and sales practices, it nevertheless competed vigorously with the latter by supplying its customers with technical assistance and other additional services. In view of our conclusion that the finding of an agreement is justified, it is a sufficient answer to this argument to reaffirm the well settled postulate that it is unlawful for competitors, by agreement, to block off any of the normal channels of competition with the purpose of establishing identical prices for products of like grade, even though other facets of normal competition may remain unfettered. F. T. C. v. Cement Institute, supra; United States v. Socony-Vacuum Oil Co., supra. This principle rests on the view that the purchasing public is entitled to an opportunity to bargain with competing firms with regard to purchase prices of products of like quality.

III. Price Discrimination.

Under Count II of the complaint, the Commission found that petitioners and Glidden were guilty of price discrimination in the sale of lead pigments in violation of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13. Specifically, it found that the zone and quantity differentials were unlawful, except that the carload discount on dry white lead was justified by cost factors on shipments made by rail.

The principal attack on these findings is that there is no substantial evidence of a probability that such price differentials would have an adverse effect on competition between petitioners' various customers. Petitioners argue that the zone boundaries for each type of pigment follow natural trade barriers, that the evidence does not support the finding that competition in fact existed between dealers in the several zones and that the zone and quantity differentials are so insignificant as to negate any effect on competition between purchasers of petitioners' products.

■ In view of the zealous contention, bordering on an argument that the

Commission must prove concretely that petitioners' price differentials have had an unlawful effect on competition, it is well to refer to the test by which such findings must be measured. Evidence of a probability that discrimination in price between competing purchasers will have the effect of injuring competition is sufficient to sustain a finding of a § 2(a) violation. As the Supreme Court said, in Corn Products Refining Co. v. F. T. C., 324 U.S. 726, 738, 65 S.Ct. 961, 967, 89 L.Ed. 1320, the statute "does not require a finding that the discriminations in price have in fact had an adverse effect on competition. The statute is designed to reach such discriminations 'in their incipiency,' before the harm to competition is effected. * * * Cf. Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 356–357, 42 S.Ct. 360, 362, 66 L.Ed. 653. But, as we held in the Standard Fashion case, supra, with respect to the like provisions of § 3 of the Clayton Act, 15 U.S.C.A. § 14, prohibiting tying clause agreements, the effect of which 'may be substantially to lessen competition,' the use of the word 'may' was not to prohibit discriminations having 'the mere possibility' of those consequences, but to reach those which would probably have the defined effect on competition." And in F. T. C. v. Morton Salt Co., 334 U.S. 37, 47, 68 S.Ct. 822, 828, 92 L.Ed. 1196, the Court again defined the test in these words: "the Commission is authorized by the Act to bar discriminatory prices upon the 'reasonable possibility' that different prices for like goods to competing purchasers may have the defined effect on competition." Cf. Corn Products Refining Co. v. F. T. C., supra, 324 U.S. at page 742, 65 S.Ct. 961. When the evidence of record is considered in the light of this test of a reasonable possibility of injury to competition, we must conclude that *most* of the Commission's findings of § 2(a) violations are substantially supported.

With respect to white lead-in-oil sales, the Commission found that petitioners discriminated in price in favor of certain dealers by selling their products at a single price within a par zone and at premiums above such price ranging from 12½ cents to $1.00 per cwt. to dealers located outside the zone. It found that these differentials constituted illegal discriminations which tended to injure competition between competing dealers located near the boundaries of adjoining zones.

Petitioners urge that the zone boundaries follow natural trade barriers, and that there is no evidence that dealers do, in fact, compete across these zonal boundaries, inasmuch as the product is marketed by them only locally, as a semi-mixed paint, to individual painters.

The evidence does tend to indicate, however, that competition is keen between dealers in paint products including white lead-in-oil. Furthermore, the evidence tends to show also that there is more than a reasonable possibility that competition would be likely to cross the arbitrary zonal walls which petitioners have erected. We need only refer to one phase of the proof in this respect, namely, that these zonal boundaries dissect 10 states, in some instances placing a single city or metropolitan area in a preferred zone status over the remainder of the state in which it is located. Illinois, Wisconsin and Kentucky are largely in a par zone, but substantial areas in the western part of each are in the 12½ cent premium zone, while the city of Saint Louis is segregated from the remainder of the State of Missouri in a par as contrasted to a 12½ cent status respectively. The cities of San Francisco, Oakland and Berkeley are par territory, while the remainder of California is in a 25 cent zone. The area immediately encompassing the cities of Omaha, and Lincoln, Nebraska, and the cities of Atchison, Leavenworth and Kansas City, Kansas, are in the 12½ cent zone as contrasted to a 25 cent status for the remaining area of their respective states. The States of Oregon and Washington are divided roughly equally between the 25 and 50

cent zones. Finally, a zonal boundary approximating the location of the Appalachian barrier separates the 25 cent zone of western Virginia from the 12½ cent status of the eastern portion of the State.

With the possible exception of the last mentioned state, the record impels us to conclude that the barriers which dictated the location of the zonal boundaries were those due to the location of plants of one or more of petitioners and to possibly other considerations known only to the trade. The inference that this division probably would have the deleterious effect on competition which § 2(a) proscribes is certainly a reasonable one which the Commission as the trier of the facts was entitled to draw from the evidence before it.

With respect to dry white lead sales, the Commission found that petitioners had discriminated in price by offering their product for sale to all customers within a par zone at a price 25 cents per cwt. below that offered to dealers outside the zone. It found also that the 25 cent carload-L.C.L. differential constituted an illegal discrimination against small purchasers, where delivery was made by local carriers, but found that this differential was a justified cost factor on shipments made by rail. Petitioners challenge each of the adverse findings.

We fail to find in the record any evidence supporting the finding of competitive injury resulting from the zone differential. Petitioners employ two zones in marketing this product, a par zone including all states east of the eastern borders of Montana, Wyoming, Colorado and New Mexico. The states west of this line are in the 25 cent per cwt. premium zone. While there is substantial evidence of a highly competitive relationship between mixed paint manufacturers, the principal consumers of dry white lead, there is no evidence that competition does in fact exist between those in the eastern par zone and those in the Rocky Mountain-

Pacific Coast premium zone. To this extent the Commission's order is without basis in fact.

But there is no merit to petitioners' contentions relative to the quantity differential. The evidence tends to indicate, and the Commission found, that a large proportion of mixed paint manufacturing is centralized in and around Chicago, Saint Louis and other metropolitan districts; that one or more of petitioners operate white lead plants in each of these areas; that shipments to such manufacturers are generally by local cartage, and, finally, that the 25 cent per cwt. premium for L.C.L. shipments bears no reasonable relationship to added costs incurred in such shipments. The reasonable probability of injury to competition is certainly a justifiable inference which the Commission was entitled to draw from this showing.

With respect to lead oxides, the Commission found that petitioners, except International, discriminated in price in favor of certain customers as follows: by selling carload lots to all customers in a par zone at a uniform delivered price 25, 50 or 75 cents per cwt. below that accorded to purchasers in each of three premium zones; by a uniform base price of $1.50 for litharge and $2.50 for red lead over AS&R's New York quotation for pig lead and adding the applicable zone differential thereto; and by charging different prices for oxides in carload and L.C.L. purchases, by adding to the carload price 40 cents per cwt. for L.C.L. purchases of more than 5 tons and 90 cents per cwt. on those of less than 5 tons. The Commission found further that the oxides are used principally by the storage battery industry, which is composed of some 200 manufacturers ranging in size from relatively small operators to industrial giants; that this is a highly competitive industry in which the little manufacturer competes not only against Exide, Willard and other large producers, but also against Sears Roebuck and other large mail order and chain store

retailers; that each of the price differentials alluded to added as much as 12 cents to the cost of production of a battery, and that an increase in cost of 5 to 10 cents per battery might, and did, during a substantial period of time involved herein, represent the difference between a profitable operation and a losing one on some types of batteries. The most favorable light which the record affords to petitioners is that the evidence as to the fact of competition and the effect of these differentials thereon is conflicting. Consequently, as that conflict has been resolved adversely to petitioners by the triers of fact, we may not substitute our judgment on this phase of the case.

We observe briefly the argument, which applies to all pigments involved, that the price differentials were such an insignificant factor that no threat of adverse effect on competition can be spelled out. For example, the added unit costs of up to 8 cents per gallon of mixed paint and of up to approximately 12 cents per storage battery are singled out. We believe, however, that this raises a question peculiarly within the competence of the Commission, and that its determination thereon, as an expert administrative body, should be accorded full respect. The Commission was conceived and created by Congress as an agency especially informed and equipped to act to sustain the vigor of the economic pulse. Perhaps in no other field is the economic pulse, as envisaged in § 2(a), so critically reflected as it is in the close relationship between added unit cost differences brought about by discriminatory pricing of raw components entering into the unit and the effect of such cost on competition within an affected industry. The courts are extremely reluctant to set aside the Commission's finding that a discriminatory price, though small, adversely affects the health of competition. See F. T. C. v. Cement Institute, 333 U.S. 683, 726, 68 S.Ct. 793, 92 L.Ed. 1010. It is noteworthy also, with respect to the § 2(a) determinations, that Commissioner Mason, who filed a vigorous dissent against other portions of the Commission's order, concurred fully in the parts pertaining to price discrimination.

## IV. Incipient Monopoly.

The complaint charged, and the Commission found, that National had, beginning in 1891, engaged in acts tending toward substantial control of and a monopoly in the pigment industry in violation of Section 5 of the Trade Commission Act. Accordingly, it ordered the company to cease and desist from acquiring or attempting to acquire any ownership of the capital stock, or properties of any of its competitors in the lead pigments field.

In this respect, National asserts that the Commission has no power under Section 5 to enjoin acquisitions of stock or assets which do not constitute a violation of Section 7 of the Clayton Act, 15 U.S.C.A. § 18. Irrespective of the Commission's power under § 5, we think the order so wanting in evidentiary support and so arbitrary that it cannot stand in any event. Therefore, we do not consider the § 5 question.

The Commission found that National was incorporated in 1891, effecting a merger of some 16 companies engaged in pigment production, and that between that date and the mid 1930's it acquired the properties of more than 30 other producers. From 1931 to about 1935, National made several attempts to acquire the facilities of Eagle-Picher, its largest competitor. Thus, beginning in 1931, National purchased substantial holdings of Eagle-Picher stock, though it never attained a position even remotely approaching majority control. The larger part of this stock was sold in 1937. Approximately 3,500 shares were retained, but these were sold in 1944. Incidentally, whether this represented merely an investment, as National insists, the record discloses that it grossed more than $800,000 in profits on the Picher stock transactions.

In addition to these findings relating to petitioner's history, the Commission relied on evidence relative to certain contracts, to which National was party, to support its ultimate conclusion of incipient monopoly. Three of these were executed on February 26, 1906. By the first, between National and AS& R, the former agreed to buy from the latter all its requirements of corroding lead, except an amount not to exceed 30,000 tons annually produced by Saint Louis Smelting Company, a wholly owned subsidiary of National, and 85% of its requirements of other types of pig lead, but not to exceed 85% of AS&R's production. Prices to be paid by National were pegged to AS&R's daily price quotations. It was agreed, further, that the excess of Saint Louis's production over 30,000 tons per annum would be sold to AS&R at a price substantially below the latter's daily quotation. The contract expired in 1921 and was not renewed. Under the second contract, National acquired all of the capital stock and securities of the United Lead Company, a holding company for all the securities of 13 producers of lead pigments. United was controlled at that time by a syndicate composed largely of AS&R's officers and directors, and AS& R had a substantial interest in United by virtue of stock ownership. By the third agreement, between AS&R and Hoyt Metal Company, a constituent company of National, Hoyt agreed to buy and AS&R to sell the latter's entire production of antimonal lead. The Commission referred to a fourth document, which, perhaps, should be mentioned in passing. In 1924 and in 1938, National agreed to supply du Pont's white lead-in-oil requirements on a processing fee basis. Under the terms of this contract du Pont furnished all raw materials and National manufactured therefrom and shipped the finished product at the former's direction on the payment of an agreed processing fee.

The ultimate finding of incipient monopoly is based on these findings as to transactions in the growth of petitioner to a dominant position in its field. We find the assertion that occurrences concluded more than twenty years before the order was entered can justify a perpetual injunction against any future acquisition of stock or physical assets of National's competitors a startling one. The Commission stated that it had not considered the question of possible antitrust violations in petitioner's growth from 1891 to the middle 1930's. Nevertheless, it relied on findings which can have no purpose save possibly to prove that a monopoly already exists to support its order which is geared solely to prevention of monopolistic practices at some undisclosed future date. Thus, the order is not supported by the findings and must fall under the principles announced in the Universal Camera case. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

█ We are not here concerned with judicial pronouncements that the Commission has authority to determine the scope necessary in a cease and desist order to prevent violations of the Act. See, e. g., May Department Stores Co. v. N. L. R. B., 326 U.S. 376, 390–392, 66 S.Ct. 203, 90 L.Ed. 145. That principle assumes a present violation of the Act, in which case the Commission is given wide latitude in framing its order to compel compliance with the Act.

But such is not the case before us. The Commission has concluded from its findings of past activities, which may have had monopolistic overtones long ago, that petitioner presently harbors a desire to swallow up all competition and that, at some undisclosed time in the future, it intends to do so. Presumably the evidence of this intent is too delicate to stand the light of day, since it cannot be found in the record. Drafted on this basis, the order before us seeks to spank the child, not for naughty acts done or threatened, but on the general principle that he may, somewhere, somehow, in the future engage in mischief. This presumes the

existence of a power even broader than that residing in a court of equity. The language of the Court of Appeals for the Fourth Circuit in the New Standard case is pertinent:

"When an order of the commission is before us for review, the statute provides that to the extent that we do not modify it, we shall use our injunctive power to enforce it, 15 U.S.C.A. § 45(c); and it is elementary that a court of equity will not enjoin one from doing what he is not attempting and does not intend to do. * * * While an administrative agency is not a court of equity, its orders must be based on evidence giving them reasonable support, and such support is not given for an order relating to present and future practices by evidence relating only to transactions which occurred a decade before it was entered. * * * No one would contend that a cease and desist order should be upheld, if all the evidence supporting it related to business practices which occurred ten years before the filing of the proceeding * * *." New Standard Pub. Co. v. F. T. C., 4 Cir., 194 F.2d 181, 183.

## V. Validity and Scope of Order.

The remaining questions relate to the validity of the order as against International and to its scope as applied to petitioners generally. These questions are hereinafter considered in the order in which they are stated.

## A. Validity As To International.

International asserts that the record shows conclusively that it ceased production of lead pigments in 1946; that, therefore, any issue as to its alleged violations has become moot and that the Commission abused its discretion in entering a cease and desist order against it.

The facts pertaining to this question are not in dispute. The original complaint was filed in 1944, and the amended complaint in April 1946. On both dates, and for about 10 years prior to 1946, International was engaged in the production and sale of white lead, both dry and in-oil, at East Chicago, Indiana. In July 1946 it ceased production and, during the following month, the sale and distribution of the product was discontinued, and the trade given notice of the cessation. At no time since then, has petitioner engaged in any phase of pigment production or marketing. In October 1946 it sold its plant and facilities to Eagle-Picher.

On completion of the evidence offered in support of the complaint, this petitioner moved to dismiss the complaint against it on the ground that it had permanently abandoned its pigment activities. Petitioner relied on the facts related above and the supporting affidavit of its vice-president stating that petitioner had sold its plant and facilities; that, with one or two exceptions, all qualified pigments technicians and sales personnel had left its employ, and that the company had no intention "ever to re-enter" the field.

The Commission denied the motion in March 1947, on the ground that "it is not unlikely that respondent may in the future see fit to re-enter" the field. However, upon the evidence submitted, the trial examiner later found that "There is no reason to believe that International will ever reenter the business of the manufacture and sale of lead pigments." Despite this finding, the Commission's order, issued in 1953, runs against International as well as the other petitioners and Glidden.

In Marlene's, Inc., v. F. T. C., 7 Cir., 216 F.2d 556, we had occasion to consider a similar situation. What we there said in reviewing decisions relative to the discretion lodged in the Commission to enter orders against discontinued practices is pertinent here; it need not be repeated. Id., 216 F.2d at page 559, and cases there cited. While the Commission is vested with a broad discretion to determine whether an order is needed to prevent the resumption of unlawful

acts which have been discontinued, this "discretion must be confined * * * within the bounds of reasonableness." Id., 216 F.2d at page 559.

This rule of reasonableness requires something more than a mere guess or suspicion contrary to the evidence and to the finding of the trial examiner that a resumption of discontinued practices may not reasonably be anticipated. As we have stated in our discussion of the monopoly question, the Commission is not empowered to "enjoin one from doing what he is not attempting and does not intend to do." New Standard Pub. Co. v. F. T. C., supra, 194 F.2d at page 183; F. T. C. v. Civil Service Training Bureau, 6 Cir., 79 F.2d 113.

The distinction on the facts between this cause and such cases as Marlene's, Inc., v. F. T. C., supra, and Galter v. F. T. C., 7 Cir., 186 F.2d 810, certiorari denied 342 U.S. 818, 72 S.Ct. 34, 96 L.Ed. 619, is readily apparent. In each of those cases it appears that the petitioning party was still engaged in the same business in which the unlawful practices had been employed, and there was evidence from which the Commission might properly infer a public need for an order despite the fact that the specific unlawful practices had in fact been discontinued. Such a situation presents quite a contrast to the undisputed fact here that petitioner is no longer engaged in the industry in which the unlawful practice occurred and has divested itself of production properties.

■ And it is immaterial that petitioner may still be engaged in the smelting and refining of pig lead. No charges were before the Commission relating to that commodity, and there is nothing in the record to support any reasonable anticipation that petitioner will ever employ that commodity in pigment production. The cease and desist order entered in the face of this showing is arbitrary and must be set aside.

B. Scope of Order.

■ There remains the question of whether the order is too broad, in that it purports to prohibit certain individual activity, i.e., whether the Commission exceeded its authority in this respect. In pertinent part the order prohibits any conspiratorial agreement or other concerted action to do those things which, according to the Commission's findings, amount to statutory violations. It expressly excludes from its edict agreements between any petitioner and its subsidiaries or affiliates which relate solely to the business of such petitioner and do not have the purpose or effect of unlawfully restricting competition. Petitioners do not challenge the propriety of the form of these provisions, but make an attack on the next paragraph, which restricts individual activity as follows:

"It Is Further Ordered that each of the respondents, its officers, agents, representatives, and employees, in or in connection with the offering for sale, sale or distribution of lead pigments in commerce, as 'commerce' is defined in the Federal Trade Commission Act, do forthwith cease and desist from quoting or selling lead pigments at prices calculated or determined in whole or in part pursuant to or in accordance with a zone delivered price system for the purpose or with the effect of systematically matching the delivered price quotations or the delivered prices of other sellers of lead pigments and thereby preventing purchasers from finding any advantage in price in dealing with one or more sellers as against another."

This portion of the order is assailed on the grounds first, that it is improper, since the complaint did not charge, and the Commission did not find, that individual use of the zone delivered price method was an unfair method of competition and, second, that the Commission is authorized under Sec. 5 to prohibit unlawful acts only and, conversely, is without power to prohibit behavior which has not been found to be unlawful.

The Commission insists that the paragraph represents an allowable judgment in its choice of a remedy, as is best shown by the language of its opinion, that

"Such a prohibition is necessary, not because it is unlawful in all circumstances for an individual seller, acting independently, to sell its product on a delivered prices basis in specified territories, but to make the order fully effective against the trade restraining conspiracy in which each of the respondents participated."

Reported judicial authorities and the elementary principles of statutory construction compel the conclusion that this paragraph is beyond the power of the Commission and must, therefore, be set aside. The grant of power in Sec. 5 of the Act is expressly restrictive. Under subsection (a) the Commission is empowered to prevent any person "from using unfair methods of competition * * * and unfair or deceptive acts or practices in commerce." Subsection (b) provides that, after a hearing and on a finding "that the method of competition or the act or practice * * * is prohibited" by the Act, the Commission may issue an order requiring the person adjudged guilty of such conduct to "cease and desist from using such method of competition or such act or practice." 15 U.S.C.A. § 45 (a, b).

 The Commission may exercise only such powers as are granted to it by statute, Arrow-Hart & Hegeman Electric Co. v. F. T. C., 291 U.S. 587, 598, 54 S.Ct. 532, 78 L.Ed. 1007, and its remedy against practices must comport precisely with the legislative grant of power The section is specific; the permissible order is restricted to a prohibition of "unfair methods of competition" found to exist. In the Arrow-Hart case, supra, the Court said, 291 U.S. at page 598, 54 S.Ct. at page 537:

"The Commission is an administrative body possessing only such powers as are granted by statute. It may make only such orders as the act authorizes; may order a practice to be discontinued and shares held in violation of the act to be disposed of; but, that accomplished, has not the additional powers of a court of equity to grant other and further relief by ordering property of a different sort to be conveyed or distributed, on the theory that this is necessary to render effective the prescribed statutory remedy."

To the same effect see F. T. C. v. Eastman Kodak Co., 274 U.S. 619, 623–624, 47 S.Ct. 688, 71 L.Ed. 1238; F. T. C. v. Sinclair Refining Co., 261 U.S. 463, 475, 476, 43 S.Ct. 450, 67 L.Ed. 746. While it is true that violations of the Clayton Act were charged in each of these cases, the same principle controls the scope of the permissible remedy under Sec. 5 of the Trade Commission Act. Compare the grant of power under the Clayton Act, 15 U.S.C.A. § 21 with that under Sec. 5 of the Trade Commission Act, 15 U.S.C.A. § 45(a, b).

To support its reasoning that it may prohibit lawful actions where such a course is deemed necessary effectively to restrain an unlawful practice, the Commission relies on certain language in the opinion in Jacob Siegel Co. v. F. T. C., 327 U.S. 608, 611–613, 66 S.Ct. 758, 760, 90 L.Ed. 888, as follows:

"The Commission has wide discretion in its choice of a remedy deemed adequate to cope with the unlawful practices in this area of trade and commerce. Here, as in the case of orders of other administrative agencies under comparable statutes, judicial review is limited. It extends no further than to ascertain whether the Commission made an allowable judgment in its choice of the remedy. * * * The Commission is the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed. * * * [A]nd the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist."

The quoted language must be read in context, in the light of the facts there involved. The Commission had determined that Siegel's trade name "Alpacuna" as applied to coats was mislead-

ing and had prohibited further use of the term. The Court of Appeals affirmed. Jacob Siegel Co. v. F. T. C., 3 Cir., 150 F.2d 751. On certiorari, the finding that use of the trade name was misleading and thus illegal was not attacked; the only question before the Supreme Court was whether the Commission properly ordered excision thereof. The Court reversed and remanded, 327 U.S. 608, 66 S.Ct. 758, 90 L.Ed. 888, on its determination that the Commission had not considered whether, by employing some qualifying language in connection therewith, use of the trade name might be preserved. The quoted language appears in the general discussion of the propriety of the excision order, and, when read in that context, does not, we believe, sanction a prohibition against lawful acts.

We have found no decision sanctioning an order such as this. True, the Commission is not restricted in its choice of a remedy "to prohibiting the illegal practice in the precise form in which it is found to have existed in the past." F. T. C. v. Ruberoid Co., 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081. It may frame its order broadly to reach all phases of existing unlawful conduct. Thus, in Ruberoid, the Commission prohibited the use of all price differentials on its findings that differentials employed by that Company of 5% and greater were discriminatory in violation of § 2 of the Clayton Act, as amended. The Court held that the Commission was not required to restrict its order to the specific differential previously used, namely 5% and greater, in the absence of a showing by Ruberoid that differentials of less than 5% might be lawfully employed.

The same principle was applied in Hershey Chocolate Corp. v. F. T. C., 3 Cir., 121 F.2d 968. On a complaint charging unfair methods of competition in the sale of one candy item, the Commission had found that similar unlawful practices were being employed in the sale of several other confectionery items as well. The court sustained an order which prohibited all such unlawful practices which the Commission had found to exist, on the theory that the entire unlawful conduct was related to the specific unlawful practice of which complaint was made.

Other cases cited by the Commission fail to support its contention. In Dorfman v. F. T. C., 8 Cir., 144 F.2d 737, no question was raised but that the practice prohibited by the challenged portion of the order was unlawful. The determination in California Lumbermen's Council v. F. T. C., 9 Cir., 115 F.2d 178, 185, certiorari denied 312 U.S. 709, 61 S.Ct. 827, 85 L.Ed. 1141, was that the practices which the Council insisted were lawful were, in fact, an unlawful restraint of competition, under the holding in Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 612, 34 S.Ct. 951, 58 L.Ed. 1490. And, finally, F. T. C. v. Wallace, 8 Cir., 75 F.2d 733, must be read in the light of the unique situation there involved. That was a proceeding brought to enforce an order. The objectionable conduct existing prior to the proceeding in which the order was entered had been accomplished through the offices of an association, composed of all individual respondents, but, as the Commission found, wholly controlled by Wallace. After a cease and desist order was entered, the association was dissolved, but Wallace continued the same practices unabated in behalf of himself and the other ex-members of the association. The Commission filed a petition against Wallace only, for enforcement of its order. His answer did not deny the averments made; he demurred on the ground, inter alia, that the order restrained concerted conduct and, therefore, enforcement could not be decreed against him alone, to restrain his individual conduct. He did not deny that his own conduct was illegal, but argued merely that it did not come within the purview of the order. The court entered a somewhat unique decree, first modifying the Commission's order to prohibit individual as well as concerted use of the admittedly unfair practice,

and then enforcing the order as thus modified, against Wallace alone.

In each of the cases upon which the Commission relies, the courts have sustained restraints only against conduct found to be unlawful, resolving all doubts in favor of the Commission's order in those gray areas wherein the legality or illegality of a particular course of conduct depends on the circumstances surrounding its use. Cf. F. T. C. v. Ruberoid Co., 343 U.S. 470, 473, 72 S.Ct. 800, 96 L.Ed. 1081. The individual practices against which this order runs are not shrouded in fog. On the contrary, the Commission expressly pointed out that it had not considered the individual use of the zone system, but concluded that the portion of the order with reference thereto was necessary in order to prevent evasion. This position presents a striking contrast to the language of the Supreme Court in F. T. C. v. Cement Institute, 333 U.S. 683, 727–728, 68 S.Ct. 793, 92 L.Ed. 1010, wherein the Court, in affirming an order prohibiting conspiratorial use of a basing point system, carefully pointed out that it did not affect individual use of such system. Although no question of individual restraint was presented, the Court's meticulousness, in emphasizing the limitations of the order before it, is important as indicative of the esteem which it attached to preservation of the individual's right to adopt and employ his own business practices, notwithstanding the fact that concerted action between competitors to employ the same practices may violate the Act.

The part of the order with which we are now concerned does not differ in any significant respect from the one we struck down in Salt Producers Ass'n v. F. T. C., 7 Cir., 134 F.2d 354, 356. There, as here, we sustained the Commission's findings that the petitioners, acting in concert, had employed a uniform zone delivered pricing basis in the sale of salt. There, as here, we sustained the determination that such concerted activity was violative of the Act and the order prohibiting its prospective use. There, as here, the complaint contained no allegations with respect to the individual use of the zone system. Petitioners were ordered to cease and desist from employing "*any common cause of action* * * * establishing or maintaining delivered price zones, or making quotations and sales of salt upon a delivered price basis under a zone system whereby the cost of salt * * * is *made identical at all destinations within such zone.*" We set the order aside saying, 134 F.2d at page 358:

"The complaint discloses the Commission's aim to eradicate and prohibit all *concert* of action by these petitioners, looking to the establishment and fixation of prices. There was no indication in the complaint that they were assailing the zone system *per se* as an unfair method of competition by one manufacturer in relation to two purchasers of his salt, in the same zone, where the freight costs are averaged, and one bears a greater burden than the actual freight cost incurred.

"If the zone system *per se* is to be condemned, there ought to be a hearing by the Commission and a finding on the precise issue of the unfairness of such a commercial practice."

Although the Salt Producers' order is not identical with that before us, we think the two cannot be distinguished in principle. The Commission asserts that the present order does not restrain all individual use of the zone system but only that which has the effect of "systematically matching the prices" of a competitor at a particular designation. The fact remains, however, that there have been no complaint, no hearing and no findings relative to the effect of such parallel individual actions. Salt Producers' Ass'n v. F. T. C., supra. Cf. F. T. C. v. Gratz, 253 U.S. 421, 424, 40 S.Ct. 572, 64 L.Ed. 993.

Clearly, the Commission was concerned here with enforcement of its order

prohibiting concerted action. In justifying the paragraph in question, it pointed up "the likelihood" that petitioners might continue to use the same zone systems and plead that they have abandoned the unlawful agreement and that such use is merely individual parallel conduct. It seems to us that this is an unwarranted anticipation of a situation which may never arise and an attempt to decide, by an anticipatory order, questions which will be a subject for this court to consider should some future enforcement proceeding become necessary. We refuse to sustain such a sweeping inroad on individual liberty of competitive action, without a prior determination by the Commission, after an appropriate hearing, that such activity is a violation of the Act. Lawful acts do not become automatically unlawful because of an administrative guess that a declaration of their illegality may facilitate enforcement of a valid order.

If individual use of the zone system by petitioners is to be restrained, that result must be achieved by a proper order in a proceeding conducted in conformity with the statute, in which the invalidity of such conduct is determined. The Commission's power to act is conditioned on such a determination. Salt Producers Ass'n v. F. T. C., supra; Cf. Arrow-Hart & Hegeman Co. v. F. T. C., 291 U.S. 587, 54 S.Ct. 532, 78 L.Ed. 1007; F. T. C. v. Eastman Kodak Co., 274 U.S. 619, 623–624, 47 S.Ct. 688, 71 L.Ed. 1238; F. T. C. v. Western Meat Co., 272 U.S. 554, 47 S.Ct. 175, 71 L.Ed. 405; F. T. C. v. Sinclair Refining Co., 261 U.S. 463, 475–476, 43 S.Ct. 450, 67 L.Ed. 746.

The order, as modified by this opinion, will be affirmed. The Commission shall, within 20 days, submit a proposed decree modifying its present order in accord with the views expressed herein and submit the same to petitioners and to this court. Within 10 days thereafter, petitioners shall consent or file objections thereto. The final decree will then be entered.