## FEDERAL TRADE COMMISSION *v.* EASTMAN KODAK COMPANY ET AL.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 215.    Argued March 10, 11, 1927.—Decided May 31, 1927.

1. The Federal Trade Commission can exercise only the administrative functions delegated to it by statute, not judicial power; and the Circuit Court of Appeals, on a petition for review, may not sustain or award relief beyond the authority of the Commission. P. 623.
2. The Commission has no authority, under § 5 of the Federal Trade Commission Act, to require a corporation to divest itself of physical property which it acquired prior to any action by the Commission, even though the acquisition and retention of the property were part of, or a step in, an unfair method of competition. P. 624.

7 F. (2d) 994, affirmed.

CERTIORARI (269 U. S. 546) to a decree of the Circuit Court of Appeals which set aside in part an order of the Federal Trade Commission, in a proceeding under § 5 of the Federal Trade Commission Act against the Eastman Kodak Company, the Allied Laboratories Association, and other parties. The order required them to desist from acts held by the Commission to constitute unfair methods of competition in the manufacture and sale of positive cinematograph films in interstate and foreign commerce. The decree below set it aside in so far as it required the Eastman Company to sell certain laboratories.

*Mr. Adrien F. Busick*, with whom *Solicitor General Mitchell* and *Mr. Bayard T. Hainer* were on the brief, for petitioner.

*Mr. John W. Davis*, with whom *Messrs. Clarence P. Moser* and *Harold G. Hathaway* were on the brief, for respondents.

MR. JUSTICE SANFORD delivered the opinion of the Court.

This writ brings up for review a decree of the Circuit Court of Appeals setting aside in part an order of the Federal Trade Commission, entered after a due hearing in a proceeding instituted by it under § 5 of the Federal Trade Commission Act,[1] by which the Eastman Kodak Company, the Allied Laboratories Association, Inc., and others were required to desist from acts held by the Commission to constitute unfair methods of competition in the manufacture and sale of positive cinematograph films in interstate and foreign commerce.

These positive films are raw materials used by film laboratories in making positive prints of motion pictures that are thrown upon the screen. The Eastman Company originated the commercial manufacture of such films many years ago. In 1920 it manufactured and sold 94 per cent. of those used in the United States; but in 1921, owing to competition by importers of films manufactured in foreign countries, its sales decreased to 81 per cent. Upon an agreed statement of facts, and the inferences which it drew therefrom, the Commission found, in effect, that thereafter the Eastman Company, with the purpose and intent of maintaining its monopoly and lessening competition in the sale of such films, acquired three laboratories used in making motion picture prints, whose combined capacity exceeded that of all the other laboratories

---

[1] 38 Stat. 717, c. 311; U. S. C., Tit. 15, § 45.

east of Chicago, and announced its intention of entering upon the manufacture of such prints; that this constituted an effective threat of overpowering competitive force which compelled the members of the Allied Laboratories—an association of manufacturers of such prints—to enter into an agreement or understanding with the Eastman Company that the members of the Allied Laboratories would use American-made films only, to the exclusion of foreign-made films, so long as the Company did not compete with them in manufacturing prints, and that the company—which continued to maintain its laboratories in readiness for operation—would not manufacture prints in competition with them so long as they used American-made films exclusively; that this agreement or understanding had the effect of lessening competition in the sale of the films in interstate and foreign commerce and sustaining the monopoly of the Company therein; and that its ownership of the three laboratories and their maintenance in condition for operation, continued to have the effect of inducing and compelling the manufacturers of prints to use only the films made by the Company.

On these and subsidiary findings, the Commission entered an order requiring the defendants to cease and desist from combining and coöperating in restraining competition in the manufacture and sale of positive films and maintaining the monopoly of the Eastman Company in their sale in interstate and foreign commerce, by the agreement and understanding that the members of the Allied Laboratories would use American-made films exclusively, provided the Company would not operate its laboratories in competition with them, and that the Company would not operate its laboratories for the manufacture of prints in competition with them, provided they used and continued to use American-made films exclusively; and by other incidental means. And the Com-

mission further ordered that for the purpose of preventing
the maintenance of the monopoly of the Eastman Com-
pany in the manufacture and sale of positive films and
restoring competitive freedom in their distribution and
sale, the Company should with due diligence sell and con-
vey its three laboratories to parties not directly connected,
or indirectly interested, with it.

On a petition by the Eastman Company and the Allied
Laboratories for a review of this order, the Circuit Court
of Appeals—without referring specifically to the purpose
for which the Eastman Company acquired and main-
tained the three laboratories—held, in substance, that the
reciprocal agreement or understanding between the East-
man Company and the Allied Laboratories that their
members would use only American-made films in the
manufacture of prints, and the Company would not oper-
ate its laboratories for the manufacture of prints, was an
unfair method of competition which the Commission had
authority to prevent; but that—one judge dissenting—
it was not unlawful for the Eastman Company to equip
itself to enter upon the business of manufacturing prints,
there being nothing unfair in its going into this business,
and the Commission had no authority to order the Com-
pany to divest itself of the laboratories which it had law-
fully acquired. 7 Fed. (2d) 994. A decree was accord-
ingly entered affirming the order of the Commission in
so far as it required the Eastman Company and the Allied
Laboratories to desist from their agreement or understand-
ing in reference to the use of American-made films and
the operation of the Eastman Company's laboratories,
but setting aside the order in so far as it required the
Eastman Company to sell its laboratories, and in other
incidental respects.

This writ of certiorari was then granted on a petition
by the Commission which challenged the correctness of
the decree of the Court of Appeals only in respect to the

setting aside of so much of the order as required the East-
man Company to dispose of its laboratories.

For present purposes we do not find it necessary to
determine the questions whether the finding of the Com-
mission as to the purpose for which the Eastman Com-
pany acquired the three laboratories—based in part at least
upon inferences from the agreed statement of facts—was
correct, and whether, in any event, it was conclusive upon
the Court of Appeals; but, in the absence of any specific
reference to this matter by the Court of Appeals, we
shall assume the correctness of the Commission's finding,
and proceed, on that assumption, to the consideration of
the only other question presented in the petition for the
writ of certiorari and pressed in this Court, namely,
whether the Commission had authority to order the East-
man Company to sell and convey its laboratories to other
parties.

The proceeding before the Commission was instituted
under § 5 of the Federal Trade Commission Act, and its
authority did not go beyond the provisions of that sec-
tion. By these the Commission is empowered to prevent
the using of " unfair methods of competition " in inter-
state and foreign commerce, and, if it finds that " any
unfair method of competition " is being used, to issue an
order requiring the offender " to cease and desist from
using such method of competition." The Commission
exercises only the administrative functions delegated to
it by the Act, not judicial powers. *National Harness,
etc. Association* v. *Federal Trade Commission* (C. C. A.),
268 Fed. 705, 707; *Chamber of Commerce* v. *Federal
Trade Commission* (C. C. A.), 280 Fed. 45, 48. It has
not been delegated the authority of a court of equity.
And a Circuit Court of Appeals on a petition to review
its order is limited to the question whether or not it has
properly exercised the administrative authority given it
by the Act, and may not sustain or award relief beyond

the authoriťy of the Commission; such review being appellate and revisory merely, and not an exercise of original jurisdiction by the court itself.

The question here presented is in effect ruled by *Federal Trade Commission* v. *Western Meat Co.*, 272 U. S. 554, 561, 563, in which the decisions in *Federal Trade Commission* v. *Thatcher Mfg. Co.* (C. C. A.), 5 F. (2d) 615, and *Swift & Co.* v. *Federal Trade Commission* (C. C. A.), 8 F. (2d) 595, that were relied upon by the Commission in its petition for the writ of certiorari, were reversed by this Court. In that case it was held that— although the Commission, having been granted specific authority by § 11 of the Clayton Act [2] to require a corporation that had acquired the stock of a competitive corporation in violation of law " to cease and desist from such violations, and divest itself of the stock held," might require the corporation to divest itself of such stock in a manner preventing its use for the purpose of securing the competitor's property—it could not, after the corporation by the use of such stock had acquired the property of the competitor, require it to divest itself of the property thus acquired so as to restore the prior lawful condition. As to this we said: " The Act has no application to ownership of a competitor's property and business obtained prior to any action by the Commission, even though this was brought about thrdugh stock unlawfully held. The purpose of the Act was to prevent continued holding of stock and the peculiar evils incident thereto. If purchase of property has produced an unlawful status a remedy is provided through the courts." And they " must administer whatever remedy there may be in such situation." Distinct reference was there made (p. 561) to § 15 of the Clayton Act, where express provision is made for the invocation of judicial remedies as need therefore may arise.

---

[2] 38 Stat. 730, c. 311; U. S. C., Tit. 15, § 21.

So here, the Commission had no authority to require that the Company divest itself of the ownership of the laboratories which it had acquired prior to any action by the Commission. If the ownership or maintenance of these laboratories has produced any unlawful status, the remedy must be administered by the courts in appropriate proceedings therein instituted.

The decree of the Circuit Court of Appeals is accordingly

*Affirmed.*

___

MR. JUSTICE STONE, dissenting.

I am unable to agree that the Federal Trade Commission, in the performance of its duties under the Federal Trade Commission Act, lacks the power to order the divestment of physical property, or that the decision in *Federal Trade Commission* v. *Western Meat Company,* 272 U. S. 554, forecloses our consideration of that question here. In the *Thatcher* and *Swift* cases considered in that opinion, the stock of competing corporations had been acquired in violation of § 7 of the Clayton Act, which prohibits the acquisition by one corporation of the capital stock of another " where the effect of such acquisition may be to substantially lessen competition." The stock control having been followed by purchase of the physical assets of the competing corporations, the Commission, proceeding under §§ 7 and 11, ordered the offending corporations to divest themselves of both the stock and the physical property. In deciding that the Commission had exceeded its authority, so far as the property was concerned, the Court expressly limited its consideration to the grant of power under §§ 7 and 11 of the Clayton Act, § 11 in terms authorizing the Commission to make an order " requiring such person to cease and desist from such violations, and divest itself of the stock held . . . contrary to the provisions of section 7 . . ."

The effect of § 5 of the Federal Trade Commission Act, dealing with the different subject of unfair competition, was put to one side, the Court saying: "This section (referring to § 5) is not presently important; the challenged orders sought to enforce obedience to § 7 of the Clayton Act." (p. 557.) The scope of the decision was thus stated: "When the Commission institutes a proceeding based upon the holding of stock contrary to § 7 of the Clayton Act, its power is limited by § 11 to an order requiring the guilty person to cease and desist from such violation, effectually to divest itself of the stock, and to make no further use of it." (p. 561.)

It was not held that the Commission under no circumstances could compel the sale of physical property, and there was in fact a clear intimation in the opinion that under § 7 of the Clayton Act the acquisition of the property after a complaint had been filed against the corporation for illegal stock purchases would not find the Commission powerless.

Section 5 of the Trade Commission Act, with which we are now concerned, declares unlawful "unfair methods of competition in commerce," and empowers and directs the Commission to prevent the use of such methods. The Commission is directed upon finding that the method of competition under investigation is prohibited by the Act, to issue its order "requiring such person, partnership or corporation to cease and desist from using such method of competition."

The powers thus broadly given sharply contrast with the specific enumeration of §§ 7 and 11 of the Clayton Act. As was pointed out in the *Western Meat Co.* case, the Clayton Act prohibits only the acquisition of stock and not the assets of the competing corporation, and in terms merely authorizes an order requiring the corporation "to cease and desist from such violations, and divest itself of the stock held. . . ." For that reason alone,

the majority of the Court thought that the language of these provisions was not broad enough to enable the Commission to order the corporation to divest itself of the physical assets thus acquired, although their acquisition aggravated and brought to its final consummation the very evil aimed at by the statute.

The comprehensive language of § 5 neither invites nor supports a narrow construction. It is general in terms, and in the authorized prevention of unfair methods of competition the Commission is not limited to any particular method of making its orders effective. The power does not any the less exist because the Commission framed the present order in part in affirmative terms specifying the manner in which the company should abandon the unfair method of competition it found had been practiced. Nor does the fact that the Commission is not a court of equity lessen the power conferred upon it by the statute. It is of course essentially an administrative agency. Its orders never have the effect of an injunction and are enforcible only by proceedings instituted in the appropriate circuit court of appeals. Its powers are not enhanced by the circumstance that its orders are enforcible in courts having in their own right equity powers. But it is likewise true that it cannot be denied powers granted by Congress merely because its orders resemble in form familiar equitable decrees. To make its want of equity powers ground for limiting those expressly conferred by the statute is to condemn all the orders ever made by the Commission. Orders compelling the sale of stock, preventing price cutting, local price discrimination, resale price maintenance, exclusive dealing arrangements, boycotting, blacklisting, disparagement of competitor's wares, misrepresentation, misbranding, adulteration, dishonest advertising, espionage, commercial bribery, coercion, threats, intimidation, the use of "fighting brands" or bogus independents, to mention

only a few of the practices which the Commission has forbidden, remind of equitable relief no less than an order compelling the sale of physical property, the very acquisition and continued possession of which may be the indispensable element in a scheme of unfair competition.

The conclusion seems to me unavoidable, therefore, that this case cannot be disposed of without determining whether the acquisition and retention of the film laboratories by the Eastman Company, under the circumstances disclosed by the record, constituted in itself or was a part of or a step in an unfair method of competition. Until that is determined we cannot say that the Commission was without power under § 5 to make any appropriate order to prevent the use of such methods.

That ruinous competition, or the threat of it, when the aim is monopoly or the suppression of competition, may be the dominant factor in a violation of the Sherman Act is no longer fairly open to question. But, in determining the meaning of " unfair methods of competition," it should be borne in mind that the Trade Commission's function is to discourage certain trade tendencies before violations of the Sherman Act have occurred. The advised use of the phrase " unfair methods of competition " for the more familiar " unfair competition " of the common law indicates an unmistakable Congressional intent to confer on the Commission the power, subject of course to the judicial review provided for in the Act, to prevent unfair trade practices not included in the prohibition of the Sherman Act and of the common law. See Henderson, Federal Trade Commission, 36; cf. *Federal Trade Commission* v. *Winsted Hosiery Co.,* 258 U. S. 483.

In that part of its order which now remains undisturbed, and which is not questioned here, the Commission has found and forbidden the agreement between the Eastman Company and the Association that the members of the Association would use American raw film, of which

it appears ninety-four per cent. of that used in the United States is produced by the Eastman Company, to the exclusion of foreign-manufactured film, provided the Eastman Company would not operate its laboratories commercially to produce positive prints in competition with the members of the Association.

The majority, not having found it necessary to consider whether the stipulated facts established unfair methods of competition because of the Commission's supposed want of power, any extended review of them here is uncalled for.  But the evidence is sufficient to justify the inference drawn by the Commission that suppression of competition in the sale of foreign films, consummated by this agreement, was accomplished in part at least by the acquisition and retention of these laboratories as a constant and imminent threat to members of the Association of competition in the business field they occupy.

Superficial examination might suggest that the respondent's course of conduct involves nothing more than the innocuous process of extending its business to include an allied trade, but the matter may not be thus lightly disposed of.  We may lay aside the question whether one already possessing monopoly powers in one field, especially where as here there is no available substitute for his products, may make use of his strategic position to dominate all phases of the industry from production to consumption.  For here it seems fairly inferable from the stipulated facts that there was no intention of permanent expansion.  The Eastman Company threatened to engage in temporary competition with the manufacturers of prints in order to attain its objective—the suppression of foreign competition in raw film.  When that was attained, the laboratories were allowed to remain idle, and the assumed advantages to the public from permanent competition were lacking.  I have no difficulty in concluding that this threat of temporary competition was unfair to the Eastman Company's purchasers and to its

foreign competitors, and was an unfair method of competition within the meaning of § 5. Compare *Tuttle* v. *Buck,* 107 Minn. 145; *Dunshee* v. *Standard Oil Co.,* 152 Ia. 618, 626–627; *United States* v. *Corn Products Refining Co.,* 234 Fed. 964, 984, 1010; *United States* v. *Central West Publishing Co.,* Decrees and Judgments in Federal Anti-Trust Cases, 359, 360, 362; *Thomsen* v. *Cayser,* 243 U. S. 66, 87; for cases which, although not exactly in point, lend support to this view.

It would seem that that part of the order which still stands, forbidding the agreement for the suppression of competition, is futile if the Eastman Company may retain the laboratories as a threat to compel the manufacturers of prints to do that which they could not lawfully agree to do. In my view, the decree below should be reversed and the order of the Commission upheld.

MR. JUSTICE BRANDEIS joins in this dissent.