The GRAND UNION COMPANY,
Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

No. 7, Docket 26553.

United States Court of Appeals
Second Circuit.

Argued Oct. 10, 1961.

Decided Feb. 7, 1962.

William Piel, Jr., of Sullivan & Cromwell, New York City (John F. Dooling, Jr., and Frederick A. Terry, Jr., of Sullivan & Cromwell, New York City, on the brief), for petitioner.

E. K. Elkins, Atty., Federal Trade Commission, Washington, D. C. (James McI. Henderson, Gen. Counsel, and Alan B. Hobbes, Asst. Gen. Counsel, Federal Trade Commission, Washington, D. C., on the brief), for respondent.

Before CLARK, WATERMAN, and MOORE, Circuit Judges.

CLARK, Circuit Judge.

This is a petition to review an order of the Federal Trade Commission, ordering petitioner, The Grand Union Company, operator of a large chain of retail grocery stores and supermarkets, to cease and desist from engaging in certain business practices held to violate § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. The order was entered upon a stipulation of facts with annexed exhibits submitted to the hearing examiner.

The proceeding arises out of a co-operative advertising arrangement, entered into jointly by Grand Union and a group of its suppliers, with Douglas Leigh, Inc., an advertising firm which owns and operates a "spectacular" advertising sign located on Broadway in the Times Square area of New York City. This sign, which covered two sides of a building, combined several large panels for stationary displays with one which contained a so-called "Epok Panel"—a bank of timed electric lamps against a black background which were used for the projection and display of animated advertisements.

On August 6, 1952, Grand Union accepted a proposal submitted to it by Douglas Leigh, Inc. By the terms of this agreement Leigh was to lease the 3625-square-foot sign to Grand Union for $50 per annum. The bulk of the sign area would be devoted to stationary displays to be designed by Leigh for Grand Union. In return, Grand Union was to solicit fifteen "participating advertisers" to buy time on the Epok Panel. Each participating advertiser would enter into a separate agreement with Leigh to rent space on the panel at a rate of $1,000 per month for one minute out of each twenty minutes in which the panel operated; thus the participating advertisers were to sign for 75 per cent of the panel's time. Grand Union received the other 25 per cent of the time on the panel, which it could use for its own advertisements, or exchange for radio or TV time. No de-

sign, layout, or copy could be used on any portion of the sign without approval by Grand Union in writing. The contract ran for one year, and Grand Union was given the option to renew it for two additional one-year periods. Leigh had the right to cancel the contract if Grand Union failed to secure fifteen contracts from participating advertisers.

A year later this contract was renewed, with modifications. Under the new terms there were to be twenty participating advertisers, each having one minute out of every twenty on the Epok Panel. Instead of receiving 25 per cent of the time on the panel, Grand Union would receive 5 per cent of the monthly rentals paid Leigh by the first fifteen participating advertisers and all of the rental paid by the remaining five. In substance this agreement continued until December 31, 1956, when the entire "co-operative" venture ended.

In the four-year period during which this spectacular sign was in operation on Times Square, thirty firms became participating advertisers. Most were solicited by Grand Union; others were brought into the project by Leigh. All, or almost all, were suppliers of Grand Union. None of the advertisers knew the terms of Grand Union's contract with Leigh: either that Grand Union paid little or nothing for its space on the sign or that Grand Union received substantial payments from Leigh by virtue of their participation. Grand Union knew and approved of all the agreements between the participating advertisers and Leigh.

Many of the participating advertisers had co-operative advertising and promotional allowance programs publicly announced and made available to all customers. Generally, however, these firms did not consider their participation in the Broadway spectacular part of those widespread promotion programs. In some instances suppliers paid Grand Union under these general programs, in addition to participating in the co-operative spectacular project. On December 5, 1957, the Federal Trade Commission issued a complaint, which charged that Grand Union, by "knowingly inducing or receiving * * * special payments and benefits from suppliers which were not made available on proportionally equal terms to [its] competitors," committed "unfair methods of competition and unfair acts and practices" in violation of § 5 of the Federal Trade Commission Act.

These transactions were before this court recently in Swanee Paper Corp. v. F. T. C., 2 Cir., 291 F.2d 833. In that case we held that Swanee, one of the participating advertisers in this Broadway spectacular sign, had, by participating in the program, violated § 2(d) of the Clayton Act, as amended, 15 U.S.C. § 13(d). This section, part of the Robinson-Patman Act amendments to the Clayton Act, makes it unlawful for a seller to pay anything of value "to or for the benefit of" his customers for services or facilities furnished "by or through" the customer in connection with the sale of seller's product "unless such payment or consideration is available on proportionally equal terms to all other" competing customers of the seller. In Swanee we found that payments by the seller (Swanee) to Douglas Leigh, Inc., were made for the benefit of the buyer (Grand Union) and that the services or facilities were rendered "by or through" the buyer. There being no dispute in Swanee that the payments were not available on a "proportionally equal" basis, we therefore upheld the decision of the Commission that Swanee had violated § 2(d). In the instant case the Commission is proceeding against the buyer in the same transactions, but not under this provision of the Act.

■ Section 2(d), as most of the Robinson-Patman Act, is aimed only at sellers; it makes no mention of buyers, even though it is difficult to conceive of a transaction violating § 2(d) which did not involve a buyer as well as a seller. Two provisions of the Robinson-Patman Act, however, apply by their terms to buyers: (1) § 2(c), 15 U.S.C. § 13(c), which outlaws payment and receipt of certain brokerage allowances, and (2) § 2(f), 15 U.S.C. § 13(f), which provides that

"[i]t shall be unlawful for any person * * * knowingly to induce or receive a discrimination in price which is prohibited by this section." The Commission does not maintain that the payments made for the benefit of Grand Union are price discriminations within the meaning of § 2(f), and thus is not proceeding against the buyer (Grand Union) under the Robinson-Patman Act. Rather, it has here determined that a buyer who knowingly solicits and receives payments which are unlawful under § 2(d) is, notwithstanding that section's silence as to buyers, nevertheless engaged in unfair methods of competition or unfair trade practices. The Commission claims that the very purpose of § 5 is to permit it to make such a determination and to bolster other antitrust statutes by outlawing acts which violate their "spirit," but not their letter.[1] Petitioner contests this determination, claiming that because Congress left buyers free of liability for their part in transactions outlawed under § 2 (d), the Commission is powerless to impose such liability under § 5. Neither party discusses the possibility that § 2(f) might be held to apply here.

We need not determine whether the payments made by the participating advertisers to or for the benefit of Grand Union are "a discrimination in price" within the meaning of § 2(f). The question whether or not that section outlaws activity such as petitioner's was left open in Automatic Canteen Co. of America v. F. T. C., 346 U.S. 61, 73 n. 14, 73 S.Ct. 1017, 1024, 97 L.Ed. 1454. There the Court, construing it, explicitly declined "to pass on the question whether a 'discrimination in price' includes the prohibitions in such other sections of the Act as §§ 2(d) and 2(e)." This issue was not raised in the proceedings below.

If the Commission were proceeding against petitioner under § 5 solely because its activities contravened § 2(f), there might be a question of the propriety of utilizing the vague language of § 5 rather than the precise standards of the Clayton Act. It has been suggested that § 5 "should *not* be invoked whenever the transaction in question is governed by specific provisions in the Clayton Act."[2] Since the Commission has explicit authority to enforce the Clayton Act, § 11, 15 U.S.C. § 21, the chief reason for such a requirement would seem to be a fear that complaints issued in the imprecise language of § 5 will not give parties adequate notice of the offenses charged and relevant defenses thereto.[3] This fear seems misplaced. Proceedings are frequently brought under this section against Sherman Act violations. F. T. C. v. Cement Institute, Inc., 333 U.S. 683, 693, 68 S.Ct. 793, 92 L.Ed. 1010; F. T. C. v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882. Litigants are not prejudiced thereby; complaints are so drafted that the particular Sherman Act offense is indicated. F. T. C. v. Cement Institute, Inc., supra. There is no reason why this cannot be done under the Clayton Act. The complaint in the instant case gives adequate notice of the nature of the offense charged, and has certainly given petitioner ample opportunity to raise defenses.

Moreover, in Fashion Originators' Guild of America v. F. T. C., 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949, the Supreme Court affirmed a holding by the Commission that a group boycott which violated § 3 of the Clayton Act, 15 U.S.C. § 14, constituted an unfair method of competition. For this case, however, we need not decide whether activity which violates the Clayton Act should *ipso facto* be a violation of § 5. The Commission here contends that petitioner's activity violates § 5 regardless of whether or not

---

1. See the Commission's decision herein: The Grand Union Co., Trade Reg.Rep. (FTC Complaints, Orders, Stipulations) ¶28,980 (FTC Aug. 12, 1960).

2. Report of the Attorney General's National Committee to Study the Antitrust Laws, March 31, 1955, 148–149 n. 78; Oppenheim, Guides to Harmonizing Section 5 of the Federal Trade Commission Act with the Sherman and Clayton Acts, 59 Mich.L.Rev. 821, 851 (1961).

3. Oppenheim, supra note 2, at 836–837.

it may be a violation of the Clayton Act; we see no objection to consideration of this contention without an examination of § 2(f). We may turn, therefore, to the question originally presented: Does § 5 extend to petitioner's activity which, while an integral part of a transaction outlawed by § 2(d) of the Clayton Act, nevertheless is not expressly proscribed by that statute or indeed by any other antitrust statute? [4]

This case has been widely mooted in the law reviews.[5] Distinguished commentators have suggested that the Commission here asserts legislative powers which if sustained will permit it to reformulate antitrust law in disregard of specific acts of Congress, and to use the vague concept "unfair methods of competition" to "supply what Congress has studiously omitted" from specific antitrust statutes.[6] Fear is expressed that the "spirit" of the Clayton Act will haunt the antitrust laws, emerging wraithlike when the Commission utters the incantation "section 5."[7] It has been adumbrated that under the Commission's rule in this case it could supply omissions in the Clayton Act left by Congress for a specific purpose; for example,

in an earlier day it might have "plugged the assets loophole in [the] original Section 7 [of the Clayton Act] without any amendatory legislation."[8] While we are sympathetic to this concern over possible misuse of § 5, we feel it is misplaced in the instant case.

In the first place there seems to be no specific reason why Congress omitted buyers from the coverage of § 2(d), while including them under § 2(c) and (f); the omission was more "inadvertent"[9] than "studious." Certainly buyers were not left out because Congress favored them or wished to permit them to engage in activity proscribed to sellers. The Robinson-Patman Act was enacted in 1936, following an investigation of large chain-store buyers, to "curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power." F. T. C. v. Henry Broch & Co., 363 U.S. 166, 168, 80 S.Ct. 1158, 1160, 4 L.Ed.2d 1124.[10] The Act outlaws several specific practices connected with the sale of commodities which had been utilized by large buyers to secure from their suppliers preferences not generally available; among these

4. The Commission has framed the complaint in the language of § 2(f) of the Clayton Act, claiming that Grand Union has knowingly induced or received illegal payments. *Inducement* might be read as not requiring receipt, and hence a buyer could violate § 5 even though the seller did not violate § 2(d). Thus § 5 might be read to apply to the buyer's attempts to have the seller violate § 2(d). We need not decide this question, as receipt was shown here.

5. Alexander, Section 5 of the Federal Trade Commission Act, A Deus ex Machina in the Tragic Interpretation of the Robinson-Patman Act, 12 Syracuse L. Rev. 317 (1961); Handler, Annual Review of Antitrust Developments, 16 The Record 385 (1961); Handler, Recent Antitrust Developments, 71 Yale L.J. 75 (1961); Oppenheim, supra note 2; Rahl, Does Section 5 of the Federal Trade Commission Act Extend the Clayton Act? 5 Antitrust Bull. 533 (1960); Note, 61 Col.L.Rev. 291 (1961); Note, 49 Geo. L.J. 379 (1960); Note, 8 U.C.L.A.L.Rev.

243 (1961).; see also Howrey, Utilization by the FTC of Section 5 of the Federal Trade Commission Act as an Antitrust Law, 5 Antitrust Bull. 161 (1960).

6. Handler, supra note 5, 16 The Record 385, 402–403, 71 Yale L.J. 75, 91, quoting from F. T. C. v. Simplicity Pattern Co., 360 U.S. 55, 67, 79 S.Ct. 1005, 1012, 3 L.Ed.2d 1079.

7. Oppenheim, supra note 2, at 837–838.

8. Handler, supra note 5, 16 The Record 385, 402, 71 Yale L.J. 75, 92.

9. One of the authors of the Robinson-Patman Act has suggested that the failure explicitly to include under the ban of § 2(f) inducement and receipt of payments violating § 2(d) and (e) was inadvertent. See Dunn, Section 2(d), and (e), New York State Bar Association Robinson-Patman Act Symposium 55, 61 (CCH 1946).

10. See remarks of Representative Patman, 80 Cong.Rec. 8111 (1936).

were "dummy" brokerage payments [11] and disproportionate advertising and similar allowances.[12] Despite the evident purpose of the Act, and for reasons not apparent in the Congressional history, many of these practices were made specifically unlawful for only one of the participants in the underlying economic transaction. The practices themselves, however, were declared contrary to the public interest and therefore unlawful. Since, in the case of § 2(d) violations, there could be no unlawful preference made by a seller unless it was received by a buyer, it is clear that Congress did not intend to sanction buyers to continue to engage in the unlawful activity.[13]

Thus the basis for resort to § 5 in the instant case differs substantially from that presented by such early decisions delineating the scope of § 5 as F. T. C. v. Curtis Pub. Co., 260 U.S. 568, 43 S.Ct. 210, 67 L.Ed. 408, and F. T. C. v. Sinclair Refining Co., 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746. In Curtis and Sinclair the FTC attacked exclusive dealing arrangements under both § 5 and § 3 of the Clayton Act. In both cases the Court found that arrangements did not violate the Clayton Act. The Curtis agreement was held to be one of agency, not sale, and therefore not within the prohibition of § 3. Similarly, in Sinclair the Court held

that agreements by gas station operators to use pump equipment supplied by Sinclair below cost solely to pump Sinclair gasoline did not bind the operators not to "use or deal in the * * * commodities of a competitor" of Sinclair, and that therefore § 3 did not apply. Since in both cases the economic activity was significantly different from that. outlawed by the Clayton Act, falling outside its "spirit" or policy, no question of using § 5 to "supplement or bolster" the Clayton Act was raised.[14]

In Sinclair and Curtis, the Court did not consider its rejection of the Clayton Act charge dispositive of the § 5 issue, for it went on to consider the question of a possible § 5 violation on its own merits. The later decision in F. T. C. v. Eastman Kodak Co., 274 U.S. 619, 47 S.Ct. 688, 71 L.Ed. 1238, however, clearly raised the question whether activity not proscribed by the Clayton Act might, by virtue of its exclusion from that statute, be beyond the reach of § 5. In Kodak, the Commission issued a cease and desist order under § 5, directing Eastman Kodak and Allied Laboratories to terminate an agreement whereby Allied agreed not to use foreign-made film, on condition that Kodak would not operate several film laboratories it had acquired to compete with Allied. The order further directed Kodak to divest

---

11. F. T. C. v. Henry Broch & Co., 363 U.S. 166, 169, 80 S.Ct. 1158, 4 L.Ed.2d 1124; F. T. C. v. Simplicity Pattern Co., 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079.

12. See Final Report on the Chain Store Investigation, Sen.Doc. No. 4, 74th Cong., 1st Sess. (1934); F. T. C. v. Simplicity Pattern Co., 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079.

13. Indeed, § 3 of the Robinson-Patman Act, 49 Stat. 1528, 15 U.S.C. § 13a, makes it a criminal offense for any person "to be a party to * * * any transaction of sale * * * which discriminates to his knowledge against competitors of the purchaser, in that, any * * * advertising service charge is granted to the purchaser over and above any * * * advertising service charge available at the time * * * to said competitors in respect of a sale of goods of like grade, quality, and quantity." This section is not frequently invoked, and

to our knowledge has not been utilized against violators of § 2(d), although the language is sufficiently broad to cover either party to a transaction in violation thereof.

14. In Curtis, the agency agreement created a set of relationships and responsibilities, unlike that which would have resulted from contracts of sale. Under the antitrust laws the difference between a "sale" and an agency relationship is not simply one of form, but may be "outcome-determinative." United States v. General Elec. Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. And in Sinclair, the very heart of a § 3 violation—sale conditioned on buyer's refusal to purchase the goods of seller's competitor —was lacking. Moreover, in neither case was there proof of injury to competition, which would have been necessary under the Clayton Act. See Howrey, supra note 5, at 166.

itself of the laboratories. The Court upheld the order commanding termination of the agreement, but set aside that part ordering divestiture. F. T. C. v. Eastman Kodak Co., supra.

It had earlier been held that the Commission lacked power under §§ 7 and 11 of the Clayton Act to order any divestiture of *assets,* even if they had been acquired by means of an unlawful stock purchase, since the "purpose of the [Clayton] act was to prevent continued holding of stock and the peculiar evils incident thereto." F. T. C. v. Western Meat Co., 272 U.S. 554, 561, 47 S.Ct. 175, 178, 71 L.Ed. 405. The Court in Kodak considered Western Meat's holding that the Clayton Act did not give the Commission such power dispositive of the question whether it might have such powers under § 5. F. T. C. v. Eastman Kodak Co., supra, 274 U.S. 619, 624, 47 S.Ct. 688, 71 L.Ed. 1238. For this reason, it was unnecessary to consider whether acquisition and retention of the assets constituted "unfair methods of competition," even though control of the assets was an integral part of the illegal agreement. 274 U.S. 619, 630, 47 S.Ct. 688, 71 L.Ed. 1238.

While the situation in Kodak bears similarities to the instant case, there are marked differences which are controlling. Western Meat explicitly held that § 7 of the Clayton Act extended only to acquisitions by stock ownership. The Court recognized that it was the harmful effect of holding companies and other forms of stock ownership which § 7 was designed to curb. This notion that § 7 was limited to the evils of stock ownership was reiterated by the Kodak decision. Since the Court there found that the limitation of the language of § 7 to stock ownership reflected a specific Congressional purpose, resort to § 5 could not be based on the need to supplement any Clayton Act

policy. Thus Kodak presents very different questions from those posed by the instant situation, for, unlike the earlier case, the Commission is not here utilizing § 5 to create a substantive extension of the Clayton Act. We do not agree that the Commission's opinion here represents an attempt to "supply what Congress has studiously omitted." [15]

Nor can we accept the notion that the Commission is here legislating a "new antitrust prohibition." [16] The practice itself is clearly proscribed by § 2(d); the novelty is solely in the application of § 5 to a buyer's knowing receipt of unlawful payments. The Commission is not upsetting specific Congressional policies; the proceedings did not "circumvent the essential criteria of illegality prescribed by the express prohibitions of the Clayton Act." [17] No economic activity, once lawful, has been suddenly brought within the prohibition of the antitrust laws. Jurisdiction, perhaps, has been expanded from the technical confines of § 2(d), but only fully to realize the basic policy of the Robinson-Patman Act, which was to prevent the abuse of *buying* power.

■ The Commission's decision here is entirely consistent with the basic purpose and policy of § 5 of the Federal Trade Commission Act. That section did not define "unfair competition"; the concept was left flexible, so that the Commission could apply the broad Congressional standard to the myriad fact situations which would arise. The Act was intended to give the Commission the power to "hit at every trade practice, then existing or thereafter contrived, which restrained competition or might lead to such restraint if not stopped in its incipient stages." F. T. C. v. Cement Institute, Inc., supra, 333 U.S. 683, 693, 68 S.Ct. 793, 799, 92 L.Ed. 1010. Activity which "runs counter to the public policy declared in the Sherman and Clayton Acts"

---

15. See note 6 supra.

16. Commissioner Tait, dissenting below. The Grand Union Co., Trade Reg.Rep. (FTC Complaints, Orders, Stipulations) ¶28,980 (FTC Aug. 12, 1960).

17. See Report of the Attorney General's National Committee to Study the Antitrust Laws, March 31, 1955, 149 n. 78.

is an unfair method of competition. Fashion Originators' Guild of America v. F. T. C., supra, 312 U.S. 457, 463, 61 S.Ct. 703, 706. Moreover, the Act was intended to be prophylactic: to stop in their incipiency acts which when full-blown would lead to monopoly or undue hindrance of competition. F. T. C. v. Raladam Co., 283 U.S. 643, 647, 51 S.Ct. 587, 75 L.Ed. 1324, 79 A.L.R. 1191; Fashion Originators' Guild of America v. F. T. C., supra; F. T. C. v. Motion Picture Advertising Service Co., 344 U.S. 392, 395, 73 S.Ct. 361, 97 L.Ed. 426.

Grand Union's activities are inconsistent with the purpose of § 2(d) of the Clayton Act, and one need not resort to metaphysical subtleties to denominate its conduct an unfair method of competition. Section 2(d) represents a Congressional determination that payments such as those made by the participating advertisers to or for the benefit of Grand Union give a firm in Grand Union's position an advantage over its competitors, especially over smaller retail firms. The Commission has found that Grand Union knowingly received the payments even though equivalent allowances were not made available to other retail grocers, large or small. Thus, by benefit of its size, Grand Union was able to secure competitive benefits in the form of free advertising and cash payments which lowered the real cost of the supplies it purchased from the participating advertisers—benefits which Congress declared to be contrary to public policy.[18] One of the original aims of § 5 was to "protect small business against giant competitiors." F. T. C. v. Raladam Co., supra, 283 U.S. 643, 650, 51 S.Ct. 587, 591. Using the policies of § 2(d) as a yardstick, the Commission has declared Grand Union's conduct to be "unfair." The plain meaning of the word would

seem to support this conclusion. Congress established the Federal Trade Commission as an expert body to apply the imprecise standards of § 5, and "[i]ts expert opinion is entitled to great weight in the reviewing courts." Jacob Siegel Co. v. F. T. C., 327 U.S. 608, 614, 66 S.Ct. 758, 761, 90 L.Ed. 888; F. T. C. v. Cement Institute, Inc., supra, 333 U.S. 683, 720, 68 S.Ct. 793. We see no reason to upset the Commission's determination.

■ Petitioner further contends that the Commission must prove injury to competition as an element of the § 5 violation. We disagree. Section 2(d) defines an offense which is illegal *per se.* F. T. C. v. Simplicity Pattern Co., 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079. There is no reason why this rule should not apply to the buyer as well as to the seller. Congress has made no such distinction; § 2(f), being the corollary of § 2(a), requires proof of injury to competition in cases brought against buyers, while § 2(c) applies a *per se* rule to buyers as well as sellers. Ibid. Since § 5 is here utilized to reach an integral part of a violation of § 2(d), and the rationale of the proceeding is to fulfill the policies of that prohibition, it would seem an unwarranted amendment of the legislative scheme to apply a different standard on the question of competitive effects to the buyer than it applies to the seller. Cf. F. T. C. v. Simplicity Pattern Co., supra, 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed. 2d 1079. In making some, but not all, of the practices outlawed by the Robinson-Patman Act illegal *per se,* Congress indicated that those selected for *per se* treatment always led to the undesired effects on competition. And *per se* violations are not unknown under § 5; price-fixing, declared illegal *per se* under the Sherman Act in United States v. Trenton Potteries Co., 273 U.S. 392,

---

18. The Senate Report on § 2(d) stated: "Such an allowance becomes unjust when the service is not rendered as agreed and paid for, or when, if rendered, the payment is grossly in excess of its value, or when, in any case *the customer is deriving from it equal benefit to his*

*own business and is thus enabled to shift to his vendor substantial portions of his own advertising cost, while his smaller competitor, unable to command such allowances, cannot do so."* [Emphasis supplied.] Sen.Rep. No. 1502, 74th Cong., 2d Sess. 7 (1936).

47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989, is a violation of § 5. F. T. C. v. Beech-Nut Packing Co., supra, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882; Standard Container Manufacturers' Ass'n v. F. T. C., 5 Cir., 119 F.2d 262.

Of course there are unique problems in the application of § 5 of the Federal Trade Commission Act to the buyer who engages in a transaction outlawed by § 2 (d) of the Clayton Act. Section 2(d) does not outlaw all payments by sellers for services or facilities rendered by their customers; it declares unlawful only those which are not offered on a proportional basis to all customers. Unlike the seller, the buyer has no control over those payments—he cannot insure that they are "proportionalized." It may be difficult even to find out whether the seller is making proportionally equal allowances available. The data are often in seller's files; and even if information is publicly available, it may be difficult to make the subtle assessments necessary to determine "proportionality." [19] It would be a harsh burden to hold that any buyer who induces or receives a payment later found to be disproportionate has engaged thereby in unfair competition. The Commission in this case has correctly limited the complaint to "knowing receipt or inducement" of disproportionate payments; and the record supports its finding that Grand Union knew, or in the exercise of reasonable care should have known, that the payments received had not been made proportionally available to its customers. Cf. Automatic Canteen Co. of America v. F. T. C., supra, 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454.

■■ In this case, presenting an admittedly novel application of § 5 of the Federal Trade Commission Act, what we said as to the need for specificity in Commission orders in Swanee Paper Corp. v. F. T. C., supra, 2 Cir., 291 F.2d 833, 837–838, has especial significance.[20] As under the new enforcement provisions of the Clayton Act, 15 U.S.C. § 21, so under § 5(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(1), violations of the order are enforceable in civil proceedings in the federal courts. Administrative agencies have a wide discretion to frame orders enjoining continuation of past practices found unlawful, as well as similar or related future violations. F. T. C. v. Mandel Bros., Inc., 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893. But this discretion does not permit an injunction of all violations of the statute just because a single violation has been found. N. L. R. B. v. Express Pub. Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. Grand Union's violations cannot be considered flagrant. In this highly uncertain area of the law Grand Union cannot be held to have known to a certainty that its part in the transactions was a violation of § 5. The arrangement attacked here has terminated, and there is nothing in the record to suggest that Grand Union intends to resume this or any related activity. We therefore hold that the order should be limited to the particular practice found to violate the statute. Swanee Paper Corp. v. F. T. C., supra, 2 Cir., 291 F.2d 833, 838. Further, since Grand Union here received as well as solicited payments, the order should also be limited to a prohibition of either knowing receipt

19. Sellers are not limited to allowances for a single type of promotional program. They may offer allowances to customers for a variety of programs tailored to the customer's needs, and still meet the requirement of "proportional equality." But the supplier must provide *bona fide* reasonable alternatives; he cannot offer a customer a service if "the economic status of [his] business renders him unable to accept the offer," for that is "tantamount to no offer to him." State Wholesale Grocers v. Great Atlantic & Pacific

Tea Co., 7 Cir., 258 F.2d 831, 839, certiorari denied General Foods Corp. v. State Wholesale Grocers, 358 U.S. 947, 79 S.Ct. 353, 3 L.Ed.2d 352.

20. Grand Union has filed a separate petition for review seeking modification of the broad terms of the order. But since this relief can be sought on the original petition, see Swanee Paper Corp. v. F. T. C., 2 Cir., 291 F.2d 833, we grant the Commission's motion to dismiss this second petition.

or knowing inducement and receipt. We have not decided whether inducement may be construed to mean solicitation without receipt, and we do not believe this issue of law should be first tested in a proceeding to enforce a cease and desist order.[21]

The decision of the Commission is affirmed. Pursuant to Rule 13(*l*), Rules of the United States Court of Appeals for the Second Circuit, the Commission shall enter an order "in conformity with the opinion," to which petitioner may object by timely filing of a counterproposal.

MOORE, Circuit Judge (dissenting).

The importance of this case is to be found not so much in its "cease and desist" order that a large grocery chain refrain from seeking for itself promotional benefits from sellers which were probably not granted to others but in its holding, in effect, that the Federal Trade Commission can arrogate to itself the legislative powers of Congress whenever there appears a field which Congress has not covered but which the Commission believes should be covered by legislation of its own making.

For the purpose of achieving moderate brevity, over-simplification may be in order. To regulate various business practices deemed to be inimical to our free enterprise economy and the public welfare Congress had passed the Sherman, Clayton and Federal Trade Commission (FTC) Acts. Specific practices were prohibited and in the FTC Act (see 5(a) (1) "unfair methods of competition" were declared unlawful.

Time passed during which each of the Acts was used by the Justice Department and the Commission to prosecute and restrain violations. For the most part, the Justice Department was the watchdog for Sherman and Clayton Act violations and the Commission for "unfair competition" practices as that term was used in common legal parlance [1] although there was some overlapping.

As the result of the growth of giant chain stores, by the mid-thirties, the large quantity buyer had assumed a place in our economy far greater than was true when Congress passed the Clayton and FTC Acts some twenty years earlier. Such concentration of power naturally placed the many smaller units in a non-competitive position. Investigation ensued. After its investigation had revealed the specific factual situations with which it desired to cope, Congress set itself to the task of formulating equally specific statutes to remedy the evils disclosed so far as it believed certain conduct should be declared unlawful. The result was the Robinson-Patman amendments to the Clayton Act which Congress must have hoped would remedy such evils.

In reading these amendments, the purpose of their enactment must be kept in mind. In enacting legislation, Congress must be presumed to intend to authorize or to prohibit those acts which are embraced within the language of the particular statutes enacted. And where the language is clear and unambiguous, the scope and coverage of the statute should be circumscribed thereby. As expressed by its co-sponsor, Congressman Patman, his bill was "to protect the independent merchant, the public whom he serves, and the manufacturer from whom he buys, from exploitation by his chain competitor" (79 Cong.Rec. 9078 (1935)). Thus, Congress was intent upon telling the buyer and the seller quite specifically what they could or could not do, each within its own orbit of activity. Con-

---

21. We find nothing in the recent opinion in F. T. C. v. Henry Broch & Co., 368 U.S. 360, 82 S.Ct. 431, 7 L.Ed.2d 353, which is inconsistent with our finding that the Commission's orders are too broad. As that case suggests, in situations where agency orders are subject to automatic enforcement in civil suits brought by the Attorney General, these orders must be clear and specific.

1. "opposed to good morals because characterized by deception, bad faith, fraud, or oppression"; FTC v. Gratz, 253 U.S. 421, 427, 40 S.Ct. 572, 575, 64 L.Ed. 993 (1920).

gress thereby was not writing a series of definitions applying to the general term "unfair competition" of the FTC Act. Quite to the contrary, it was prohibiting certain practices in no manner dependent upon the basic facts underlying a legal conclusion of unfair competition. The amendments are completely integrated and unambiguous. They do not have to receive support from any section of the FTC Act (except for enforcement). Each of the subparagraphs is designed to serve its own separate purpose.

Section 2(a), directed against sellers, prohibited discrimination in price between purchasers but only where such discrimination had an anti-competitive effect. Sections (c) and (e), relating primarily to sellers and to brokerage and services, are not applicable here. The two sections here involved are sections 2(d) and 2(f). Section 2(d), a seller's section, makes it unlawful to pay "to or for the benefit of a customer" compensation for services furnished by the customer which are not made available on proportionally equal terms to all other customers competing in the distribution of the commodity sold. In other words, what the seller gives to one he must make available to the other. No words are found in the section making it unlawful for the buyer to receive such payments for services. The failure to include the buyer clearly could not have been inadvertent because the very purpose of the legislation was to curb the power of the mass buyer. Moreover, it would, indeed, have been anomalous in a statute designed to encourage competition to put the stamp of unlawfulness on buyers who attempted to secure better commercial advantages for themselves before making their purchases.

Section 2(f) is a buyer's section making it unlawful for him "to induce or receive a discrimination in price." Two qualifications are specified. The act must be done "knowingly" and the discrimination, limited to "price," must be one which is "prohibited by this section [Sec. 2]." The Commission, however, is not

proceeding under this section obviously because "price" is not involved and because it does not wish to be burdened by the proof required to support a violation.

The complaint is a hybrid. Certain words of section 2(f), "knowingly inducing or receiving," are combined with the provisions of 2(d), namely, benefits not made "available on proportionally equal terms." The Commission then adds phrases to be found in 2(a) that the practices complained of "are to the prejudice and injury of competitors and the public" and have a tendency to obstruct and restrain commerce. Unable to charge (much less prove) a violation of 2(a), 2(d) or 2(f) and unable to avoid the inexorable mathematical law that three zeros still total zero, the Commission precipitately abandons the Clayton Act which had so generously contributed its language (but not its blessing) to the complaint and by *force majeure* seeks the protection of its natal act, alleging that Grand Union is guilty of "unfair methods of competition and unfair acts and practices in commerce, in violation of Section 5 of the Federal Trade Commission Act." Having just cast off sections 2(d) and (f), the Commission quickly returns to them to turn (by some alchemic process) these two paragraphs not violated by Grand Union into a violation of section 5.

The Commission cannot find any direct Clayton Act violation and, therefore, has to rely on a violation of its "spirit" as constituting unfair competition. So, likewise, is the majority forced to concede that Grand Union's activity "is not expressly proscribed by that statute [sec. 2(d)] or indeed by any other antitrust statute" (Maj.Op., p. 96) and that the Commission is using section 2(d) "notwithstanding that section's silence as to buyers" to support its conclusion of unfair competition by a buyer (Maj.Op., p. 95).

This case, as the majority concedes, presents "an admittedly novel application of § 5 of the Federal Trade Commission Act"—as indeed it does. And yet there is really not so much novelty as there

is presented a good illustration of a difference in judicial philosophies, namely, whether Commissions and courts are to interpret and enforce the laws which Congress has enacted or whether they should by judicial legislation create laws which in their opinions they believe should have been enacted. Thus, in this case neither the Commission nor the majority can understand why a Congress, which carefully delineated the sanctions it wished to impose against sellers and buyers, omitted buyers from the coverage of § 2(d). For want of any justifying reason, they conclude that the omission must have been "inadvertent"—scarcely flattering to a Congress which had the benefit of a lengthy investigation on the subject and showed itself quite capable of dealing with those who received (2(c), 2(f)) insofar as it felt it should deal with them.

Another consequence of Commission and judicial legislation is that all such laws are *ex post facto*. It has always been a sound policy (if only from the point of view of fair play) that businessmen have an opportunity to know that which is permitted and that which is proscribed so that they may act accordingly. When our system permits any group of individuals whether they be commissioners or judges to substitute their personal conceptions of the "spirit" instead of the words of our statutes, we, indeed, have a government of men and not laws.

Regardless of half-hearted disclaimer, the Commission and the majority in supporting its decision are actually rewriting either section 2(d) or 2(f). They are either adding to 2(d), in substance, the words "and it shall also be unlawful for any such person to receive such benefits" or they are deleting from 2(f) the words "discrimination in price which is prohibited by this section" and substituting the words "any of the benefits set forth in 2(d) above." As Commissioner Tait so directly says in his clarion dissent, the decision "in effect, legislates a new antitrust prohibition."

Referring to the Commission's decision, Professor Handler, who has long been an astute analyst of developments in the antitrust field, has said: "The plain implication of the opinion is that the Commission, whenever it discovers limitations in legislative language which cannot be overcome by the liberal processes of statutory construction, can utilize the convenient vagueness of the concept of 'unfair methods of competition' as an independent source of power 'to supply what Congress has studiously omitted'[111] [Footnote 111: "Federal Trade Commission v. Simplicity Pattern Co., 360 U.S. 55, 67, 79 S.Ct. 1005, 3 L.Ed. 2d 1079 (1959)] from its enactments." (Handler, Review of Antitrust Developments, The Record, Ass'n of the Bar of the City of New York, Vol. 17, No. 7, p. 402, October, 1961.)

The majority frankly recognize that, "Distinguished commentators have suggested that the Commission here asserts legislative powers which if sustained will permit it too reformulate antitrust law in disregard of specific acts of Congress" and are "sympathetic to this concern over possible misuse of § 5" but they find "no specific reason why Congress omitted buyers from the coverage of § 2(d)" and, hence, conclude that the omission must have been more inadvertent than studious. If, however, the Commission under Section 5 has such broad unlimited powers to fill in assumed omissions, then "the specific acts of Congress in the antitrust field which the Commission administers are essentially superfluous" (Handler, pp. 402–3).

Moreover, even if it be assumed that the Commission can fathom the unenacted intent of Congress and amend either section 2(d) or section 2(f) (by way of Section 5 of the FTC Act) so as to reach buyers knowingly receiving unlawful payments, there still remains the question of whether injury to competition must be shown. While a seller's participation in a 2(d) transaction is a *per se* violation, a buyer's participation in a 2(f) transaction is not. A buyer's conduct cannot be condemned under 2(f) unless the Commission can show injury to competition. Thus, if we assume with the

majority that Section 5 can be used to reach buyers such as Grand Union, we still must decide whether to look to 2(d) or to 2(f) to determine the other "indicia of illegality." [2] In answering this question, the majority again feels that it can clearly sense the pulse of Congress in 1936 and concludes that Congress would have wanted the court to make the buyer's participation in a 2(d) transaction a *per se* violation of Section 5. My senses are not so keen, and I cannot find any evidence that Congress would have expanded 2(d) rather than 2(f)—had it desired to extend the Act to buyers.

Without evidence of specific Congressional intent, we should not be responsible for creating a *per se* violation. To do so is to ignore the policy conflict of the Robinson-Patman Act with the other antitrust laws, including the FTC Act. See Mr. Justice Frankfurter, dissenting in FTC v. Motion Picture Advertising Service Co., 344 U.S. 392, 405, 73 S.Ct. 361, 97 L.Ed. 426 (1953). To the extent that the Robinson-Patman Act inhibits price and service competition generally, it may often conflict with the objective of the antitrust laws of protecting and fostering vigorous competition for the benefit of the public (and not for the benefit of the individual competitors). The Supreme Court has indicated that, where Congress has left the courts free to make the determination, this conflict is to be resolved in favor of the "broader policies" of the antitrust laws. Automatic Canteen Co. v. F. T. C., 346 U.S. 61, 74, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953). The narrow areas of *per se* illegality which Congress created in the Robinson-Patman Act should not be expanded by us. We should not make the buyer's inducement and receipt of a promotional allowance illegal in the absence of a showing of injury to competition when the only prohibition Congress directed to buyers allows the buyer this defense.

There is nothing incongruous about holding that the Commission must find injury to competition to enjoin the buyer when it need not so find to enjoin the seller. In the later case it is enforcing a specific Congressional prohibition; whereas, in the instant case, the majority, in effect, is allowing the Commission to legislate under its general grant of authority in Section 5.

I would set aside the Commission's order.

---

**2.** "The identical indicia of illegality should govern, moreover, whenever the Commission chooses to pursue exclusive arrangements as 'unfair methods of competition' forbidden by Section 5 of the Federal

Trade Commission Act." Att'y Gen. Nat'l Comm. Antitrust Rep. 148 (1955) (Judge Barnes and Professor Oppenheim, Co-Chairmen).